UNITED STATES of America ex rel.
Robert RICE, Relator,

v.

Leon J. VINCENT, Superintendent, Greenhaven Correctional Facility, Stormville, New York, Respondent.

No. 73 Civ. 177.

United States District Court,
S. D. New York.

July 17, 1973.

William M. Kunstler, Center for Constitutional Rights, Louis M. Steel, New York City, Edward Leopold, Brooklyn, N. Y., Conrad J. Lynn, New York City, Chester L. Mirsky, New York City, for relator.

Frank S. Hogan, Dist. Atty. New York County, by Herman Kaufman and Robert J. Lehner, Asst. Dist. Attys., for respondent.

OPINION

TYLER, District Judge.

This is a petition for a writ of habeas corpus sued out by Robert Rice, presently incarcerated at the Greenhaven Correctional Facility in Stormville, New York under life sentence for murder in the first degree, attempted murder in the first degree and attempted robbery in the first degree.[1] A new trial is prayed, or, in the alternative, an opportunity by way of an evidentiary hearing to establish the factual allegations set forth as the basis of the application for a new trial. For reasons hereinafter discussed, it is ruled that (1) no evidentiary hearing is required, and (2) the writ will issue unless relator is afforded a new trial within sixty (60) days from the date of this memorandum.

BACKGROUND

Robert Rice was one of the original "Harlem Six", six youths accused of the robbery of a small clothing store on West 125th Street in Manhattan, the murder of Margit Sugar and the near murder of her husband, Frank Sugar, the proprietors.[2]

1. New York Penal Law, McKinney's Consol.Laws, c. 40 §§ 1044(1), 1044(2) and 2124.

2. Indictment No. 2195/1964.

The crimes occurred on April 29, 1964, and the six were tried and convicted in the late spring of 1965. All appealed, but their convictions were affirmed by the Appellate Division, First Department. As to five, Robert Rice, Ronald Felder, William Craig, Daniel Hamm and Walter Thomas, the affirmance was unanimous, and no opinion was written.[3] Wallace Baker, the sixth, engendered a 4–2 split among the Justices as his confession, admitted into evidence at the trial, had been extracted by police after his attorney had left the station house, and in spite of that lawyer's explicit instructions that Baker was to make no statements and that he wished to be present at any questioning of his client.[4]

The case was reviewed by the Court of Appeals and the convictions of all of the defendants set aside.[5] The principal ground for reversal was the use of statements and confessions of several of the six in ways prejudicial under Bruton v. United States [6] to the others. Baker's conviction was set aside on the secondary ground that his confession was in fact inadmissible. Rice, who had confessed, raised the issue of the voluntariness of his statement, but the findings of the trial court on this point were upheld.[7] A sweater, introduced into evidence at the trial, was found to have been taken during the course of an illegal search of Rice's residence.[8] On this ground, also, the Court of Appeals reversed his conviction. Finally, to avoid Bruton difficulties, severance was ordered as to Rice and Hamm, leaving Baker, whose confession could not be introduced, Felder, Craig and Thomas to be tried as what came to be known as the "Harlem Four."

The four were retried in early 1971 but the jury could not agree. A third attempt by the State ended on January 27, 1972 with another hung jury; thus, after eight years of incarceration, the four defendants were allowed to go free on bail pending further action. A fourth trial was decided upon by the State, but pleas of guilty to the reduced charge of manslaughter in the first degree and conspiracy were accepted on April 4, 1973. The four were sentenced on that day to time served, and left the courthouse free men. Also, in the interest of fairness, Justice Jacob Grumet ordered that each be issued a certificate of relief from civil liability.[9]

Rice was not as fortunate. Alone of the six, as Hamm ultimately decided to and did plead guilty to lesser included charges,[10] Rice was retried and convicted on April 11, 1970 of the counts set forth in the 1964 indictment. Sentencing occurred on September 9, 1970. The conviction, on direct appeal, was affirmed by the Appellate Division, First Department, on May 23, 1972,[11] and leave to appeal was granted by the New York Court of Appeals on June 30, 1972. So far as is known to the writer, argument of that appeal has not been heard.

Subsequent to Rice's second trial, Robert Barnes, Jr., a principal witness for the prosecution, a would-have-been seventh member of the group who, it is asserted, participated in the planning of the crime, recanted his testimony in two lengthy notarized affidavits. Then, dur-

3. People v. Felder, et al., App.Div., 282 N.Y.S.2d 644 (1967).

4. People v. Baker, 28 A.D.2d 24, 281 N. Y.S.2d 161 (1967).

5. People v. Baker, et al., 23 N.Y.S.2d 307, 296 N.Y.S.2d 745, 244 N.E.2d 232 (1968).

6. 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed. 2d 476 (1968).

7. 296 N.Y.S.2d at 751–752, 244 N.E.2d 232.

8. Id., at 752–754, 244 N.E.2d 232.

9. See, Transcript of Plea and Sentencing of Wallace, Baker, Felder, Craig and Thomas before Justice Jacob Grumet of the Supreme Court, Part 37, New York County, New York, April 4, 1973.

10. See, Transcript of Plea of Daniel Hamm before Justice Frederick Backer, Supreme Court, New York County, New York, April 20, 1971.

11. 39 A.D.2d 840, 332 N.Y.S.2d 1010 (1st Dept.1973).

ing the course of the last actual trial of the "Harlem Four", it was revealed that a fingerprint found at the Sugars' store, identified as that of Robert Rice, had initially been given a "no-value" designation by a police department expert, which label continued for almost a year until reassessed by a different police expert on the eve of the original trial of the six defendants.

As under New York practice a direct appeal can raise only what is found within the four corners of the record,[12] Rice moved, on July 31, 1970, pursuant to § 440.10 of the Criminal Procedure Law to vacate his conviction and obtain a new trial, claiming that on the state of the evidence as then known, the jury might well have reached a different verdict.

The Supreme Court of New York, New York County, denied the motion in an opinion dated September 10, 1972.[13] Rice then sought leave to appeal to the Appellate Division, First Department, which was denied for lack of a substantial question of law or fact on November 21, 1972.[14]

An application for leave to appeal the latter decisions of the trial and intermediate appellate courts was made to the Court of Appeals of New York on November 30, 1972. Four days later, on December 4, 1972, notification was received, signed by the Deputy Clerk of the Court of Appeals, to the effect that the order of the Appellate Division was not appealable.[15]

There being no further recourse available to him in the courts of New York,

Rice, on January 19, 1973, presented this collateral attack upon his conviction to this federal district court.

### THE EVIDENCE

When Rice was convicted in April, 1970, the People's evidence consisted of a confession signed by Rice, the eyewitness identification of Olin Roe, a clerk at a drugstore adjacent to the Sugars' store, the eye-witness accounts of Barbara and Constance Wright, who were in the same drugstore on an errand for their aunt, the testimony of Robert Barnes, Jr. and the fingerprint of Rice found at the scene of the crime.[16]

### A. The Confession

During the night of April 29, 1964, Robert Rice signed a statement of confession prepared by Detective Joseph E. Halk, and later responded in the presence of a stenographer to questions by Assistant District Attorney Robert J. Lehner. On motion of the defense, Mr. Justice Culkin of the Supreme Court of New York, New York County, on March 31, 1965, determined that the results of the question and answer session were to be suppressed, but allowed the signed statement to be read to the jury.[17] This action was affirmed by the Appellate Division and later the Court of Appeals.[18]

The statement described Rice meeting with the other five defendants between 3:30 and 4:00 in the afternoon of April 29, 1964, and the ultimate decision of the group to rob the Sugars' clothing store. Hamm was to be the look-out, and the others were to enter in two waves. Suits, raincoats and any currency that

12. See, generally, New York Code of Criminal Procedure, §§ 519, 528.

13. Petition of Robert Rice, Exhibit D.

14. No. H–10621, Petition of Robert Rice, Exhibit H.

15. Petition of Robert Rice, Exhibit J.

16. These are the essential points of the People's Case, as set forth in Respondent's Exhibit 2, p. 2. In discussing the evidence, reference will be made to testimony and events of all of the proceedings involving any and all of the original six. For the sake of clarity all cita-

tions to the retrial of Robert Rice will be to the record on appeal submitted to the Appellate Division, First Department, and will be designated "Rice, Record on Appeal." Citation to the trial of the six will be to the record on Appeal submitted to the Court of Appeals, and will be designated "6, Record on Appeal." References to proceedings as to the "four" will be designated "4, First" or "Second Retrial."

17. TR 497, Rice, Record on Appeal.

18. *Supra*, at 3–4.

might be found in the cash register were the objects of the venture.

During the course of the actual attempt, the statement continued, Mr. Sugar panicked, and Felder stabbed him. Rice then pushed Mrs. Sugar to the floor and Felder killed her. All fled, taking nothing with them, and regrouped at the apartment of Rice's grandmother.[19]

Above Rice's signature on the statement were those of Detective Halk and Detective Sergeant Robert Wilson, the officers who conducted the interrogation.[20]

This confession was extracted from Rice before the Supreme Court's landmark decision Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and would clearly have been inadmissible had it not been for the accident of its chronology.[21] Rice was held totally incommunicado by police after his arrest in the early evening of April 30, 1964. Repeated telephone inquiries by his mother and David Scheinfeld, an attorney acting at the behest of Mrs. Rice, were unavailing, as the police would not even verify that Robert had been taken into custody.[22] Mrs. Rice, however, had seen Robert actually led into the station house on West 123rd Street,[23] and she, along with Robert's godfather, Richard Procter, and David Scheinfeld came there in person and demanded to see him. This they were not allowed to do until after he had signed an admission of guilt.[24]

Rice was seventeen years old at the time, and accused of a crime for which, if convicted, he could be sentenced to death under then applicable New York law, Penal Law of 1909 § 1045-a. He was not given food or drink from the time of his arrest until the next day, and not asked if he wanted to contact an attorney, a parent or a friend.[25] He claims that he was abused physically, first by Detective Halk, then by a number of officers, and that during his interrogation, he was handcuffed to his chair.[26]

### B. The Testimony of Olin Roe

Olin Roe, in April, 1964, worked as a clerk in the drugstore directly adjacent to the Sugars' clothing store, and was there on the afternoon of the 29th. Directly after the incident, however, when questioned by police, he denied having recognized anyone. He repeated his denial in a television interview the next morning, and, in fact, continued to deny having recognized anyone for a year thereafter, despite repeated inquiries by police and assistant district attorneys.[27]

On April 28, 1965, Roe was arrested for grand larceny. A trial subpoena was served upon him on May 6, and, nine days after his arrest, on May 7, he appeared in court to testify as a prosecution witness at the trial of the six.[28]

Roe testified that in fact he did recognize those involved in the robbery on April 29, 1964, and that several of the "six" were those that he had seen on that day.[29] He was certain of his iden-

---

19. Halk TR 1515–18, Rice, Record on Appeal.

20. Halk TR 156, 1518, Rice, Record on Appeal.

21. See, Jenkins v. Delaware, 395 U.S. 213, 213–214, 89 S.Ct. 1677, 23 L.Ed.2d 253 (1969) holding that *Miranda* did not apply to retrials of cases originally tried prior to June 13, 1966.

22. Scheinfeld TR 56–60, Rice, Record on Appeal.

23. Geneva Rice TR 96, Rice, Record on Appeal.

24. Lehner TR 33–41, Rice, Record on Appeal.

25. Halk TR 1489, Rice TR 1916, Rice, Record on Appeal.

26. Rice TR 1912–13, Rice, Record on Appeal.

27. Roe TR 4356–8, 4360–62, 4381–82, 4, Second Retrial.

28. Roe TR 4359–63, 4382–84, 4, Second Retrial.

29. Roe TR 4269–72, 4, Second Retrial, TR 1291, Rice, Record on Appeal. Roe asserted that his prior denials were due

tification, as he had come to know the defendants during the fourteen years he had lived in the neighborhood,[30] although at one point, during the second retrial of the "Harlem Four", he identified one of the defendants as Hamm, who, as set out above, had been severed from the case and was not present in court.[31]

At the first trial in 1965, Roe stated that he had seen the group run by from inside the drugstore as he was on his way to investigate banging noises.[32] The number was "[a]s best as I can answer, I say I saw four . . .," and "[a]bout five or six. . . ."[33] At the retrial of Robert Rice, however, his account varied. He had gone, at the request of his employer, Dr. Julius Levit, to investigate screams heard coming from next door. As he reached the door to the clothing store, he saw five or six men around Mrs. Sugar, who was bent over, and Mr. Sugar who was "hollering". He then ran back to the drugstore and hid in its basement.

Dr. Levit, Roe continued, called to him to come out of the basement, which he did, and he returned to the street in time to see the group go by. Rice was one of the group.[34]

Roe's arrest on April 28, 1965 for grand larceny became a charge of petty larceny to which he plead guilty on September 1, 1965, after the trial of the six had been concluded. He was sentenced on October 22 to probation.[35] He admitted to having stolen cash, drugs and, apparently, a hypodermic needle from the drugstore, and to having related this to the prosecutors before he testified.[36] And, even after being placed on probation, he stated that he had shoplifted from Lord & Taylor, where he had found temporary employment.[37]

The purpose of this illicit activity was to support Roe's $40 to $50 per day heroin needs. His "habit" required repeated hospitalization for detoxification from early 1964 until the end of 1965, when he went on a program of methadone maintenance.[38]

Roe also admitted to being a transvestite.[39]

## C. The Testimony of Constance and Barbara Wright

Barbara Wright, 13 years old at the time of the event, and her sister Constance, 8 years old in April, 1964, were called as prosecution witnesses at the several trials.

Constance was found by the court at the trial of the six to have been too young to take the oath, but did give sworn testimony at the retrial of Rice. She described having seen a group of boys run by with blood on their hands; she identified these from photographs as Thomas, Baker, Hamm and Felder.[40] Rice was not mentioned by Constance.

She also contradicted the testimony of Olin Roe (that given by him at the retrial of Rice), by stating that she did not see Roe leave the drugstore on April 29th.[41]

to threats he and his family had received. These threats, however, he claims, began on April 30, 1964, and therefore do not explain his conduct on the 29th when he was first questioned. Roe TR 1427, Rice, Record on Appeal.

30. Roe TR 1292–99, Rice, Record on Appeal.

31. Roe TR 4486–94, 4, Second Retrial. *See also supra* at 4.

32. Roe TR 990–93, 6, Record on Appeal.

33. Roe TR 992–93, 6, Record on Appeal.

34. Roe TR 1284–91, Rice, Record on Appeal.

35. Respondent's Exhibit I, p. 14.

36. Roe TR 4406–14, 4, Second Retrial.

37. Roe TR 4122–24, 4404, 4, Second Retrial. There is also a reference to an out-of-state arrest and disposition in the winter of 1971, at pp. 4332–33, 4392, 4, Second Retrial.

38. Roe TR 4312, 19, 23, 99, 4430, 4, Second Retrial.

39. Roe TR 4317–4320, 4, Second Retrial.

40. Constance Wright TR 1443–47, Rice, Record on Appeal.

41. Constance Wright TR 1464–68, Rice, Record on Appeal.

Barbara's testimony was essentially the same as that of her sister, but she was able to identify only Thomas, Hamm and Felder.[42] On the night of April 29, 1964, however, while being shown photographs by police, she identified as a participant, one Freddy Frazier, never a defendant in any of these proceedings. She first told the grand jury that she did not recognize the boys she saw running away, but then proceeded to identify five photographs, those of all the defendants but Rice. She also admitted at the trial of the six that prior thereto, when she had been shown the five photographs by the prosecution, she was told that ". . . those were the boys." [43]

Barbara also contradicted the account given by Roe at the Rice retrial. Roe had testified that as he was leaving the drugstore for the second time, when he claimed to have glimpsed the six fleeing, he literally ran into Mr. Sugar.[44] Barbara, however, described a man, undoubtedly Mr. Sugar, entering the pharmacy, before the perpetrators had left the clothing store, stating that somebody killed his wife.[45]

On April 18, 1968, Barbara was adjudged a youthful offender and sent to Westfield State Farm, Bedford Hills. About a year before, she had participated in an armed robbery—the theft of a wallet, ring and automobile from an individual while he was held at bay with a piece of pipe.[46]

D. *The Testimony of Robert Barnes, Jr.*

The jury at the second trial of Robert Rice heard the testimony of Robert Barnes, Jr. Barnes recounted that he had been with the six from about 3:30 on the afternoon of April 29, 1964 until a few minutes before 5:00 P.M., when, enroute to the Sugars' store, his father, Robert Barnes, Sr., called out to him to come and settle a dispute with their landlady. Barnes complied with his father's request, and the six continued on without him. During that hour and a half, he asserts, the plans for the crimes were set.[47]

Barnes and his father left their apartment at approximately 5:45, and, after passing by the Sugars' store and noting puddles of blood on the floor, Robert, Jr. headed for the apartment of Rice's grandmother. There, he met Rice, Baker, Thomas and Craig and was informed that the robbery had been attempted, but was unsuccessful. Rice, he continued, admitted to stabbing Mrs. Sugar.[48] After a graphic description by Rice of the events, Barnes himself suggested that the group scatter, which they then did.[49]

The jury was also told of a statement written by Barnes on March 15, 1970, labeled by him an "affidavit", although neither verified nor notarized, which appears to run about a page in length. In it, Barnes described being held incommunicado by police on April 29 and 30, 1964, that his life and the lives of his family were threatened, apparently, by the police, and that he had been attacked by seven policemen in the station house. He was 18 at the time, frightened, and claims to have been coerced into giving false testimony. The six, the statement continued, were innocent.

Barnes asserted therein that he was not coerced in any way to execute the statement, but did so to relieve his con-

---

42. Barbara Wright TR 823–33, Rice, Record on Appeal.

43. Barbara Wright TR 3398–3408, 4, Second Retrial.

44. Roe TR 1291, Rice, Record on Appeal.

45. Barbara Wright TR 822, Rice, Record on Appeal.

46. TR 3458, 4, Second Retrial.

47. Robert Barnes, Jr. TR 251–72, Robert Barnes, Sr. TR 231–2, 240–2, Rice, Record on Appeal.

48. Robert Barnes, Sr. TR 230–35, Rice, Record on Appeal.

49. Robert Barnes, Jr. TR 274–84, Rice, Record on Appeal.

science of his role in bringing about their convictions.[50]

At the trial, however, Barnes claimed to have executed the statement after being threatened by Rice when they were both incarcerated at the Tombs in New York City. He then reiterated his testimony given at the trial of the "six".[51]

It was also brought out that on October 4, 1968, Barnes was arrested, that he pleaded guilty to robbery on March 26, 1969, and was then sentenced to a term of eight years. For some reason, not at all clear from the record, Barnes was re-sentenced to a shorter term on February 16, 1970.[52]

*E. Fingerprint Identification*

Likely the most convincing of the proofs against Rice put in by the State was People's Exhibit 17–M–1, a finger-print taken from the metal frame flank-ing the door to the Sugars' store on April 29, 1964. Sergeant John Ferrara, then in the Identification Section of the New York City Police Department, iden-tified the print as that of the left ring finger of Robert Rice.[53] No mention was made of the earlier designation of "no value" given to this fingerprint.

## POST-CONVICTION DEVELOP-MENTS

*A. The Barnes' Recantation*

On June 30, 1972, some two years aft-er Rice had been convicted for the sec-ond time, Barnes, then incarcerated at the Clinton Correctional Facility at Dan-nemora, New York, wrote attorney Wil-liam Kuntsler that the "Harlem Six are innocent." Kuntsler responded by visit-ing Barnes, and, on July 3 and 5 assist-ed him in executing two notarized affi-davits, combined totaling some 38 pages in length.

In these affidavits, Barnes asserts that conscience, not threats or other coercion, served as the motivation for his recantation. Referring to his prior recantation, he claims that it had not been induced by threats as he had stated at the Rice retrial, and that, instead, fear of prosecution for his "admitted" involvement in planning the Sugar mur-der and for his perjury were responsible for his contradicting that recantation on the witness stand. If called on again to testify, he would now tell the truth as is purportedly contained in these state-ments.

The day of April 29, 1964 is described in detail. Barnes claims to have been with Thomas until 3:30 P.M., then with his father until 5:00 P.M., when he re-turned to Thomas' house. When the po-lice arrived, at about 6:00 P.M., he was sitting on the stoop of Thomas' building.

He was taken to Harlem hospital, presented to Mr. Sugar, who could not identify him, and then removed to the 28th precinct. The next morning, after being questioned and returned to his cell, others were put in the cell with him. To one of these, Barnes said he had an idea as to who had been involved in the Sugar murder and robbery. This, he asserts, was done to impress his lis-tener.

Soon after, the affidavit continues, he was questioned again in the manner of the classic third degree; he was threatened physically, warned of "the chair", confronted with his earlier state-ment to his cellmate and harassed for being a Black Muslim. Finally, he told the story that eventually became his tes-timony. This, he asserts, was a fabrica-tion.

To construct his fabricated testimony, Barnes claims to have put together what he had heard while being taken by police to and from Harlem Hospital, what he had learned from Thomas, Craig and Felder while alone with them in a room at the station house late on the night of

50. Robert Barnes, Jr. TR 312–16, Rice, Record on Appeal.

51. Barnes, Jr. TR 330–33, Rice, Record on Appeal.

52. Robert Barnes, Jr. TR 324–25, Rice, Record on Appeal.

53. Ferrara TR 1137, Rice, Record on Appeal.

the 29th, and what details he was supplied by his interrogators during his questionings. He added a participant, however, one Leslie Stanley, and unrealistically described the group as carrying large commando knives in their belts, in plain view.[54]

Finally, on this subject, Rice now avers in his papers before this court that Barnes, after giving to Rice's attorney the affidavits, was spirited away by state agents to another correctional facility and rendered inaccessible to all but police and prosecutors.[55] Counsel for the State have responded to this with the claim that it possesses a recantation by Barnes of the recantation produced and relied upon here by Rice.[56]

## B. The Fingerprint

During the second retrial of the "four", on direct examination of Sergeant Ferrara by Assistant District Attorney Lehner, it was revealed that Sergeant Ferrara's identification of People's Exhibit 17–M–1 as the fingerprint of Robert Rice had been made on May 19, 1965 and, further, that the print had sat for over a year with a designation of "no value" given it by police expert David Goldstein on April 30, 1964.[57]

No value, according to Ferrara, meant that there would not be enough upon which to base a search or identification,[58] and, in fact, no check of prints taken from Rice was made against 17–M–1 until it had been reclassified. The reclassification had come as a result of a request by Assistant District Attorney Loguen in May, 1965 to take a second look at the prints.

Ferrara testified that he had discussed the reclassification with Detective Goldstein, and that Goldstein agreed that the prints were valuable.[59]

---

54. The letter and affidavits referred to above were appended to petitioner's original moving papers, and are part of the court file in this case.

55. Affidavit of Michael Feit.

56. Affirmation of Herman Kaufman, at 6.

## THE MERITS

It is undisputed that Barnes did in fact recant his trial testimony in the manner set forth above. Whether that recantation represents his true recollection of the events of April 29, and 30, 1964, is a matter for a jury, not a court, to pass upon. The fact that People's Exhibit 17–M–1 was originally designated "no value", and that this was revealed only after Rice had been tried and sentenced for the second time has been conceded by the State. There is little to be gained, therefore, by way of an evidentiary hearing.

The hard question presented here is whether or not due process concepts mandate a new trial for Rice. The retrial evidence against Rice, doubtless sufficient as a whole to support a verdict of guilt, nevertheless tends to weaken in proportion to the depth of scrutiny to which it is subjected. Given the unimpeached fingerprint evidence of Sergeant Ferrara and the Barnes' testimony as it was at the time, such matters as the circumstances of Rice's confession, the obvious weaknesses and infirmities of the other witnesses and the confused core of their testimony do not loom sufficiently large to cause concern of a constitutional dimension. Once doubt is cast upon the fingerprint evidence and Barnes decided to submit at least formally verified recantations, the total picture changes markedly. Though couched somewhat differently, this is the central theme of Rice's petition; he argues that both the "no value" designation and Barnes' verified recantations are "newly discovered" evidence requiring a new trial. I am constrained to agree.

Respondent presses the contention that Barnes' recantation affidavits are not "newly discovered evidence", as that

---

57. Ferrara TR 4182, 4199, 4, Second Retrial.

58. Ferrara TR 4199, Rice, Record on Appeal.

59. Ferrara TR 4243, Rice, Record on Appeal.

term is defined in Larrison v. United States, 24 F.2d 82 (7th Cir. 1928), and its progeny,[60] in that the essential element of surprise is not present, the defense having had the first recantation available to it at the second trial. At the very least plausible, this claim raises questions about the qualitative difference between the recantations, the fact that the later one was contained in notarized affidavits while the first was a simple statement and that recantations are generally to be viewed with suspicion. *See* United States v. Troche, 213 F.2d 401 (2d Cir. 1954). But, as I view the matter, it is unnecessary to resolve such questions. Although respondent refuses to concede as much, there is at least one piece of unassailably "newly discovered evidence" in this case—the initial designation of the fingerprint, People's Exhibit 17–M–1, as being of no value. Once such evidence is proffered, the evidence as a whole must be weighed; the whole includes the second recantation of Barnes.

 Where newly discovered evidence is found to exist, a new trial, in the federal system, is required where such evidence " . . . may have had an effect on the outcome of the trial . . .," Napue v. Illinois, 360 U.S. 264, 272, 79 S.Ct. 1173, 1179, 3 L.Ed.2d 1217 (1959), or, if it would ". . . in any reasonable likelihood have affected the judgment of the jury . . .," Giglio v. United States, 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972). Assessing the possible effect of presenting to a jury the change in labels of the fingerprint and the second recantation of Barnes, as well as the matter contained in the record, I find that the standard has been met.

Due to highly unusual procedural quirks, this problem is before a federal district court after trial and exhausted post-conviction proceedings but before argument and disposition of Rice's direct state appeal. Surely, this is a situation where every sensitivity to federalist principles should be observed. But, counterbalancing this is the need to insure that fundamental fairness be accorded a defendant in a criminal case, Fay v. Noia, 372 U.S. 391, 415–426, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963), which can only be done by a federal court now that Rice has exhausted all relevant state remedies.

 Townsend v. Swain, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963), is a mandate to the federal district courts not to abstain where problems of constitutional magnitude are present. Where substantial injustice is the alternative, as it appears in this case, and given the record in this proceeding and those involving the trials and dispositions of the rest of the "Harlem Six", I see no other course but to direct that Rice be retried within a reasonable time or be released. United States ex rel. La Belle v. Mancusi, 404 F.2d 690 (2d Cir. 1968).

The writ of habeas corpus shall issue sixty days from the date of this opinion unless in that time Rice is brought to trial before a jury of his peers by the State of New York.

It is so ordered.

---

60. United States v. DeSapio, 435 F.2d 272 (2d Cir. 1970); United States v. Miller, 411 F.2d 825 (2d Cir. 1969).