UNITED STATES ex rel. Robert RICE,
Relator-Appellee,

v.

Leon J. VINCENT, Superintendent, Green-
haven Correctional Facility, Storm-
ville, New York, Respondent-Appellant.

Nos. 364, 365, Dockets 73–2195, 73–2196.

United States Court of Appeals,
Second Circuit.

Argued Oct. 19, 1973.

Decided Feb. 7, 1974.

Lewis M. Steel, New York City (Wil-
liam M. Kunstler, Conrad J. Lynn, and
Chester Mirsky, New York City, on the
brief), for appellee.

Robert A. Goldschlag, Asst. Dist.
Atty., for New York County (Frank S.
Hogan, Dist. Atty., New York County;
Michael R. Juviler and Lewis R. Fried-

man, Asst. Dist. Attys., on the brief), for appellant.

Before MEDINA, LUMBARD and TIMBERS, Circuit Judges.

LUMBARD, Circuit Judge:

Leon J. Vincent, the Superintendent of the Greenhaven Correctional Facility of Stormville, New York, appeals from an order entered on July 17, 1973, in the Southern District which granted the petition of Robert Rice, a prisoner in the facility, for a writ of habeas corpus unless the State of New York granted him a new trial within 60 days. Rice was convicted in the Supreme Court for New York County of the crimes of murder in the first degree, attempted murder in the first degree, and attempted robbery in the first degree after a trial before a jury lasting from March 11, 1970, to April 9, 1970. On September 22, 1970, Rice was sentenced to life imprisonment for murder; from 12½ to 25 years for attempted murder; and from 7½ to 15 years for attempted robbery, the sentences to be served concurrently.

After the trial it was learned that a prosecution witness, Robert Barnes, Jr., had recanted his testimony and that a fingerprint at the scene of the crime which a police expert testified was Rice's had originally been given a "no value" designation by another police expert. Rice made an appropriate motion for a new trial on the grounds of newly discovered evidence, which Justice Fine of the New York Supreme Court denied. Leave to appeal this order was denied by Justice Steuer of the Appellate Division, which decision was not appealable. Having thus exhausted his state remedies, Rice filed a petition for a writ of habeas corpus in the Southern District. Judge Tyler agreed with Rice's contention that, in light of the new evidence, due process required a new trial and, without holding a hearing, he ordered that the writ be granted unless Rice is retried within 60 days. 361 F.Supp. 843 (S.D.N.Y.1973). On August 3, 1973, Judge Tyler also granted Rice's motion for bail pending appeal of his order. On September 5, another panel of this court stayed the bail order pending disposition of this appeal, 486 F.2d 215 (2d Cir. 1973), and at argument we denied a motion to vacate this stay.

I.

On April 29, 1964, there was an attempted robbery of a small clothing store on West 125th Street in Manhattan owned by two Hungarian immigrants, Frank and Margit Sugar. During the course of the attempted robbery, Margit was killed and Frank was seriously wounded. Following an intensive police investigation, Wallace Baker, Ronald Felder, William Craig, Robert Rice, Daniel Hamm, and Walter Thomas (who came to be known as the "Harlem Six") were indicted for murder, attempted murder, and attempted robbery. A trial was held in the spring of 1965 at which all six were convicted and sentenced to life imprisonment. At the trial the confessions of Hamm, Baker, and Rice were introduced. None of these defendants testified. The Appellate Division, First Department, affirmed the convictions, People v. Baker, 28 A.D.2d 24, 281 N.Y. S.2d 161 (1967); People v. Felder, 28 A.D.2d 823, 282 N.Y.S.2d 644 (1967) (no opinion); but the New York Court of Appeals reversed and ordered three new and separate trials, People v. Baker, 23 N.Y.2d 307, 296 N.Y.S.2d 745, 244 N.E.2d 232 (1968). The court held that Baker's confession should have been excluded, but upheld the trial court's finding that Hamm's and Rice's confessions were admissible. It also held that a sweater seized from Rice should have been excluded. Finally, the court ordered separate trials for Rice and Hamm on the grounds that use of their confessions, which implicated the other four, at the trial of the six had violated the mandate of Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968).

As noted earlier, Rice was retried and convicted again in April 1970. The conviction was affirmed without opinion by the Appellate Division, People v. Rice,

39 A.D.2d 840, 332 N.Y.S.2d 1010 (1972). On June 30, 1972, the New York Court of Appeals granted leave to appeal, but we have been informed that the appeal will not be heard until the collateral attack before us is decided.

The other five were more fortunate. Hamm pleaded guilty in April 1971 to lesser included charges. The remaining four were tried in early 1971, but the trial ended with a hung jury. Another trial was held in January 1972 and ended in yet another hung jury. On April 4, 1973, the four pleaded guilty to manslaughter in the first degree. They were sentenced that day to the time that they had already served and were thus set free.

### II.

#### A. Rice's confession.

■ The issue of whether due process requires a new trial necessitates a recital in some detail of the evidence adduced at Rice's second trial in 1970. Probably the most important piece of evidence was Rice's own confession. Prior to the first trial it was claimed that the introduction of the confession into evidence would be unconstitutional and a suppression hearing was held pursuant to Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1965), and People v. Huntley, 15 N.Y.2d 72, 255 N.Y.S.2d 838, 204 N.E.2d 179 (1965). The trial judge ruled that Rice's oral statements and a written statement would be admissible, but that a later stenographic record of a question-and-answer session would be suppressed, evidently because it occurred after Rice's counsel had arrived at the station house but before he had been allowed to see Rice. See Escobedo v. Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964). The New York Court of Appeals affirmed this order, and the correctness of this decision is not before us. Admittedly, Rice was not told of his right to remain silent or to have counsel present since the interrogation took place before the decision of Miranda v.

Arizona, 384 U.S. 486, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), but it is clear that *Miranda* does not apply to confessions introduced at retrials if the first trial began before that decision was rendered, as is the case here. Jenkins v. Delaware, 395 U.S. 213, 89 S.Ct. 1677, 23 L.Ed.2d 253 (1969).

Rice was picked up about 5:00 on the afternoon of April 30, 1964. At 7:30 Detective Halk and Sergeant Wilson began to question him. At first Rice denied all knowledge of the murder, and Wilson went into an adjoining room to speak to Hamm, who was then confessing. When Wilson returned, he told Rice that he knew about the plan to rob the store and the identity of the participants. Rice then confessed. While he recounted the details a second time, Halk prepared a written statement, which Rice signed at about 11:30 P.M.

In both the oral and written statements Rice admitted that he and the other five had met the day before on 129th Street to plan the crime. Hamm was to be the lookout. Rice, Thomas, and Baker first entered the store with shopping bags, and Thomas asked where the size forty suits were. The proprietor pointed to the suit rack. Felder and Craig came in a few minutes later and the proprietor began to panic. Felder then stabbed the owner with a knife. His wife tried to grab the phone and Rice knocked her down and Felder stabbed her. Confused and frightened, the group then fled from the store without taking any money or suits. The police testified that no officer beat or threatened Rice.

Testifying in his behalf, Rice said that he denied all knowledge about the crime and was then handcuffed to a chair and was savagely beaten. He still refused to confess but he did sign a statement that Halk had written even though he did not know what it said. When he saw his attorney that night, the first thing he said was "I did it." His attorney, David Scheinfeld, said that Rice appeared to be in a state of shock but that he saw no bruises or oth-

er signs of beating. Rice explained his exclamation by saying that he feared Scheinfeld was another policeman and that he did not want another beating. This is despite his claim that he had withstood prior severe beatings and despite the fact that he had met with Scheinfeld about twenty times previously in an unrelated civil matter.

In rebuttal the prosecution introduced evidence showing that Rice had made no complaints about being beaten when he was arraigned the next day, May 1. The same day Rice was interviewed at the Manhattan House of Detention for Men and filled in a form saying his physical condition was "okay." The interviewer testified that he would have recorded any observations of marks and bruises on Rice, which he did not. Finally, a physician who examined Rice at the Brooklyn House of Detention, to which Rice was then transferred, stated that he did not detect any bruises, discoloration, or swelling on Rice's body.

### B.   Ollin Roe's Testimony

Ollin Roe testified that he was working in the drugstore adjacent to the clothing store at the time of the crime. He heard a commotion next door and banging on the walls. The pharmacy owner, Julius Levitt, sent Roe next door to see what was happening. Roe looked through the front door of the store and saw a couple of fellows around Mrs. Sugar and heard Mr. Sugar screaming. Roe recognized Rice, Felder, Hamm, and Thomas. Roe ran back into the pharmacy and went into the basement. Levitt said that he looked "agitated." Levitt called Roe from the basement and told him to go back to the Sugars' store. Near the front door of the pharmacy,

Roe saw five or six young men run by and turn up Fifth Avenue.

By way of impeachment, it was shown that Roe said on the night of the crime that he had not recognized any of the perpetrators of the crime. It was not until early 1965 during his second visit to the district attorney's office that Roe said he could recognize some of the persons involved. Roe explained this delay by saying that he and his family had been threatened, but they had not been threatened before he was questioned on the night of the crime. Moreover, his testimony at the first trial was that he had seen the group running by but that he had not seen them in the store.

■ Roe was arrested on April 28, 1965, on a grand larceny charge. Roe claimed that this arrest occurred after his visit to the district attorney's office. He subsequently pleaded guilty to a petit larceny charge and was put on probation. Roe also admitted that he had started using narcotics after the murder and that he had been detoxified three times.[1]

### C.  Barbara Wright's and Constance Wright's Testimony

Barbara Wright, then 13, and Constance Wright, then 8, were sent to Levitt's store by their aunt on April 29, 1964, to buy a jar of Noxema. When they were coming out of the store, they saw a group of boys running by. Barbara recognized Thomas, Hamm, and Felder as boys she knew from the neighborhood. Constance, who was too young to testify at the first trial, identified in court photographs of Thomas, whom she knew, Hamm, Baker, and Felder. Each girl's testimony conflicted in minor ways

1.   The district court in its recitation of facts used testimony introduced to impeach witnesses at later trials of the four, but not in Rice's own trial. We believe that this use of impeaching evidence was improper. Since newly discovered evidence that merely impeaches a witness (absent suppression by the prosecution) is not grounds for granting a new trial, United States ex rel. Fein v. Deegan, 410 F.2d 13, 20 (2d Cir.), cert. de-

nied, 395 U.S. 935, 89 S.Ct. 1997, 23 L.Ed.2d 450 (1969) ; United States v. Aguillar, 387 F.2d 625 (2d Cir. 1967), it should not be used for the purpose of determining whether newly discovered substantive evidence is material. The materiality of such evidence should be determined by reference to the record in the case at issue, not by reference to the trials of other defendants.

with Roe's. Constance did not see Roe run out of the drugstore, although she admitted that she was not paying attention to the boy who worked in the store. Barbara's testimony indicated that Mr. Sugar staggered into the drugstore at an earlier moment than Roe said he did.

### D. Robert Barnes, Jr.'s Testimony

Robert Barnes, Jr., testified that Thomas, Craig, Baker, Hamm, Rice, and he were talking on a stoop at 134 West 129th Street and that Baker said that he could probably get them some suits. The five proceeded to another building where in the hallway Baker announced a plan to rob a store on 125th Street. Tentative plans were made. Baker said that he and Rice, the two with knives, would kill the proprietors. The group moved on to Thomas' apartment and were joined by Felder. There it was agreed that Hamm would be the lookout. Barnes, Craig, and Thomas were to enter the store with shopping bags and Thomas was to ask for the size 40 suits. Together with Felder, they were to fill the bags with suits after Baker and Rice came in and killed the owners. The seven left for the store, but when they passed Barnes' home at about 5:00 P.M., his father called him in and told him to apologize to the landlady for an incident that occurred the previous day.

Barnes did not leave his home until 5:45, when his father left for work. Passing the store, Barnes saw police inside and pools of blood on the floor. He went to Rice's grandmother's apartment. In the living room were Rice, Baker, Craig, and Thomas. Barnes asked where the suits were and Rice answered that there were none because Felder had panicked. Rice, giving a demonstration of technique, said that he had stabbed the woman. Since it was "hot in the streets," it was agreed that the group would leave in pairs. Barnes was picked up that night and under questioning confessed his part in the planning of the crime.

Prior to the murder Barnes had been convicted of petit larceny and loitering.

Since Barnes spent 15 months in custody as a material witness, the sentences on both convictions were suspended. In March 1966 (after the first trial) Barnes pleaded guilty to third degree robbery and was sentenced up to 5 years. He was paroled after 2½ years. In June 1969 he pleaded guilty to second degree robbery and was sentenced up to 8 years. In 1970 this was reduced to up to 6 years. In October 1969 Barnes was sentenced to up to 4 years for parole violations, to be served concurrently with the terms for robbery. Prior to the sentencing for the robbery convictions the sentencing courts were informed of Barnes' cooperation in the Sugar case and prior to his testimony at the second trial the assistant district attorney promised to send the parole board an account of his cooperation.

While he was in prison, Barnes wrote letters to Thomas' mother saying he would not testify against the six at a new trial. On March 15, 1970 (about two weeks before he testified at the second trial), he wrote an "affidavit" saying that his statements against the six had been coerced by the police, who had coached him in what to say. Barnes later repudiated this recantation and reiterated the testimony he had given at the first trial. He claimed that the letters were sent in response to threats his fiancee had received and that the "affidavit" was written after Rice, who was in the same cell block at the Manhattan House of Detention for Men, had threatened him.

### E. Fingerprint Evidence

The store was processed for latent fingerprints on the morning of April 30, 1964. One print was found on the glass door. Sergeant Ferrara testified that the print was Craig's. Another print was removed from the metal door frame. Ferrara said that the print was Rice's. Rice claimed that he and Craig had been to the store in early April, about three weeks before the crime, but that he, Rice, had stopped at the door and not gone inside. Joseph Katz, a window

washer, testified that he had washed the glass door on Monday morning before the murder, which occurred on Wednesday afternoon. A police expert said that the prints in question were probably not more than five days old on April 30.[2]

### III.

At the second retrial of the four, Assistant District Attorney Lehner on Direct examination of Ferrara elicited testimony that the fingerprint said to be Rice's had originally been given a "no value" designation in a preliminary examination by a Detective Goldstein. This meant that in Goldstein's opinion the print was useless for purposes of identification even when matched against only a few known prints. It was only shortly before the first trial in 1965, when Assistant District Attorney Loguen, the prosecutor in the first trial, asked Ferrara to recheck the prints, that the print on the doorframe was matched with a finger of Rice. Apparently Lehner, who prosecuted Rice's second trial, did not know of the no value designation until shortly before the last trial of the four in January 1972.

Ferrara testified that he had discussed the print with Goldstein who agreed with him that the print was valuable and he would so testify if called. The defense did not try to exploit Goldstein's designation, except to refer to it during summation. Neither Goldstein nor an independent fingerprint expert was called.

On June 30, 1972, Barnes, who was then in the Clinton Correctional Facility at Dannemora, New York, wrote a letter to William Kunstler, an attorney who had represented the four, which in essence stated that the Harlem Six were innocent. Kunstler proceeded to visit him and assist him in preparing two affidavits on July 3 and July 5. The first affidavit describes in some detail how the police coerced him into testifying. The second describes how they taught him what to say. After these affidavits were published, Rice's attorneys claimed that Barnes was taken from Clinton and only police or prosecutors were allowed to see him. Whatever the truth of these allegations, Lehner filed an affidavit stating that Barnes had repudiated his new recantation and had said that it was the result of inmate pressure.

### IV.

As noted above, we are hearing this collateral attack on the conviction before the New York Court of Appeals has heard the direct appeal. The issue before us, therefore, is a narrow one: Does due process require that New York give Rice a new trial because of Barnes' recantation and Goldstein's original designation of the fingerprint as being of no value? We hold that due process does not necessitate a new trial in these circumstances.[3]

The standard adopted by the federal courts in determining whether a witness' recantation necessitates a new trial, at least where allegations of police or prosecutorial misconduct are made,[4] is that stated in Larrison v. United States, 24 F.2d 82, 87–88 (7th Cir. 1928) (emphasis original):

[A] new trial should be granted when,

(a) The court is reasonably well satisfied that the testimony given by a material witness is false.

2. There were, of course, other prosecution witnesses, but they could not identify any of the participants. Besides introducing the theory of a police plot that used coerced testimony, the defense had Rice's grandmother testify that Rice was with her alone before and at the time of the crime, but in an earlier question-and-answer session recorded in the district attorney's office she said that she saw Rice with five boys in the hallway between 4:30 and 5:00.

3. We agree with the district court that no hearing was required since no fact necessary for a determination of this case is in dispute.

4. See United States v. DeSapio, 435 F.2d 272, 286 n. 14 (2d Cir. 1970), cert. denied, 402 U.S. 999, 91 S.Ct. 2170, 29 L.Ed.2d 166 (1971).

(b) That without it the jury *might* have reached a different conclusion.

(c) That the party seeking the new trial was taken by surprise when the false testimony was given and was unable to meet it or did not know of its falsity until after the trial.

Assuming *arguendo* that the *Larrison* standard applies to this case, the State of New York is not required to grant Rice a new trial under that standard. As we said in United States v. Troche, 213 F.2d 401 (2d Cir. 1954), recantations of testimony given at trial are " 'looked upon with the utmost suspicion.' " *Id.* at 403, quoting Harrison v. United States, 7 F.2d 259, 262 (2d Cir. 1925). We are not reasonably well satisfied that Barnes' testimony at trial was false. Barnes gave essentially the same testimony at four trials before petit juries. Three of these trials occurred after an earlier recantation. We also doubt that the verdict might have been different. Besides Barnes' testimony the jury had before it Rice's confession, Roe's identification of Rice, the fingerprint evidence, and the corroborating identifications by the Wright sisters. Rice's efforts to discredit his confession, to say the least, must have strained the jury's credulity.

Finally, it is clear that Rice was not taken by surprise by the second Barnes' recantation. This second recantation is in essence similar, if more detailed, than the one introduced to impeach Barnes at the retrial. Under the third prong of the *Larrison* test, Rice clearly knew of the possible falsity of Barnes' testimony and was able to attempt to meet it.

The requirements of due process in this situation are certainly not more rigorous than the *Larrison* test that the federal courts have adopted and followed in the exercise of their supervisory powers. The State here had a valid interest in protecting the finality and integrity of its judgments. While the charges of police misconduct are serious, Rice had an opportunity to present these charges in a full and fair hearing before a jury prior to his convictions at his retrial. Consequently, the recantation alone is not sufficient to require a new trial. See Townsend v. Sain, 372 U.S. 293, 317, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963).

V.

The district court felt that it did not have to decide whether the recantation alone mandated a new trial since it felt that the no value designation of the fingerprint together with the recantation were sufficient to require a new trial. 361 F.Supp. at 851. We disagree.

■ Since at least Assistant District Attorney Loguen knew of Goldstein's designation of the print, the cases governing prosecutorial suppression of matters favorable to the defense are relevant. The fact that the assistant district attorney who actually tried the Rice case did not know of the designation is irrelevant. Giglio v. United States, 405 U.S. 150, 154, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). The Supreme Court has held that due process requires reversals of convictions when the prosecution, after a request by the defense, fails to disclose material evidence, favorable to the defense, regardless of whether the failure is in good faith. Moore v. Illinois, 408 U.S. 786, 92 S.Ct. 2562, 33 L.Ed.2d 706 (1972); Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). In cases where no request was made but where hindsight discloses that the evidence might have been put to "not insignificant use," we have said that the standard of materiality must be "considerably higher." United States v. Keogh, 391 F.2d 138, 147–148 (2d Cir. 1968).[5]

5. In *Keogh*, we said that no request was necessary if the prosecutor suppressed evidence for the purpose of obstructing justice or failed to disclose evidence whose high value to the defense could not have escaped his attention. 391 F.2d at 146–147. There is no allegation of deliberate suppression and the Goldstein designation is not of such high value that it could not be overlooked. Indeed, it appears that the prosecution be-

The State claims that Rice made no request that would require it to furnish the results of Goldstein's preliminary investigation. Rice claims that a request was made for prior statements of witnesses pursuant to People v. Rosario, 9 N.Y.2d 286, 213 N.Y.S.2d 448, 173 N.E. 2d 881, cert. denied, 368 U.S. 866, 82 S. Ct. 117, 7 L.Ed.2d 64 (1961). Appellant denies that any such request was made at any of Rice's trials during the fingerprint testimony. No such request appears on the record before us. Even if there was such a request, it is difficult to see how it would perform the "valuable office of flagging the importance" to the defense of Goldstein's preliminary work since Goldstein did not testify. *Keogh, supra,* 391 F.2d at 147.

We need not decide that issue since the value of Goldstein's designation is immaterial under the standard appropriate even if a request had been made. Cf. Moore v. Illinois, *supra.* In so holding, we take into account Barnes' second recantation,[6] as did the district court. Barnes' testimony was corroborated by Rice's own confession which paralleled Barnes' testimony, except that the confession said that Felder actually stabbed Mrs. Sugar, while Barnes testified that Rice had said that he had. This discrepancy hardly damaged the prosecution's case. As noted above, Rice's attacks on his confession were unsuccessful. In addition, there was Roe's identification of Rice at the scene, of the crime and the Wright sisters' testimony which identified other participants and thus helped to verify the confession and Barnes' story. Although many of the witnesses were subject to serious attacks on their credibility, the cumulative effect of their testimony and Rice's confession more than adequately support the jury's conclusion without the fingerprint evidence.

Moreover, it is difficult to see how the original designation of no value was material in contradicting Ferrara's identification of the print on the doorframe as being Rice's. Goldstein's designation took place during a preliminary investigation, and Ferrara testified that Goldstein now agreed with Ferrara that he had been mistaken. "We know of no constitutional requirement that the prosecution make a complete and detailed accounting to the defense of all police investigatory work on a case." Moore v. Illinois, *supra,* 408 U.S. at 795, 92 S.Ct. at 2568. It is not even claimed that the print was not Rice's.[7] No effort was made at the second trial of the four alone to call either Goldstein or an independent expert to testify. No claim that an outside expert had concluded that the print could not be identified as Rice's was made in the affidavits submitted to the district court. We, therefore, conclude that introduction of the Goldstein designation would have had no weight in aiding the jury's determination of Rice's guilt or innocence. Cf. United States v. Tomaiolo, 378 F.2d 26 (2d Cir.), cert.

lieved that the designation was favorable to it since the designation showed that the initial police investigation was impartial and not an attempt to frame Rice.

6. However, we doubt if it was proper for the district court to use the second recantation at all. As stated above, the issue of whether Barnes' testimony was procured by police coercion was heard at the retrial. The State has a valid interest in not retrying this issue. It seems proper to determine the materiality of the no value designation solely on the record of the first trial and not consider its materiality in light of the second recantation.

7. Imbler v. Craven, 298 F.Supp. 795, 809–811 (C.D.Cal.1969), aff'd, 424 F.2d 631 (9th Cir.), cert. denied, 400 U.S. 865, 91 S.Ct. 100, 27 L.Ed.2d 104 (1970), which Rice cites, is not relevant here. There the police testified that there were no identifiable prints on a case left by the murderer when in fact there was a print left which was not Imbler's. Here there is no alleged suppression of evidence showing that the print was someone else's. Rather, we have only the fact that an initial disagreement between police experts on whether the print was identifiable was not revealed.

denied, 389 U.S. 886, 88 S.Ct. 159, 19 L.Ed.2d 184 (1967).

Accordingly, the order must be reversed and the case remanded with directions to dismiss the petition.

Reversed.