Manuel CONCEPCION, Petitioner,

v.

UNITED STATES of America,
Respondent.

No. CV 97–2171(ADS).

United States District Court,
E.D. New York.

Jan. 24, 2002.

Manuel Concepcion, Lompoc, CA, Petitioner Pro Se.

Ruth M. Liebesman, Esq., Attorney Assisting Petitioner, New York City, for Petitioner.

Alan Vinegrad, United States Attorney, Eastern District of New York by Jo Ann M. Navickas, Assistant United States Attorney, Brooklyn, NY, for Respondent.

## MEMORANDUM OF DECISION AND ORDER

SPATT, District Judge.

Petitioner Manuel Concepcion ("Petitioner" or "Concepcion") brings this proceeding, pursuant to 28 U.S.C. § 2255, seeking an order to vacate, set aside or correct his sentence.

### I. *BACKGROUND*

Concepcion and many other defendants, nine of whom were on trial with him, were charged with being members of a major drug ring called the "Unknown Organization," that operated a retail and wholesale narcotics business in certain areas in Brooklyn. The Unknown Organization was led by Ricardo Melendez, consisted of approximately 100 members and grossed over ten million dollars a month from heroin sales, together with additional revenue from cocaine transactions. The Organization sold its narcotics in glassine envelopes stamped with particular brand names, such as "Unknown," "Critical," "Rated PG," and "No Mercy."

The Unknown Organization purchased large quantities of pure heroin which was cut by an expert called "Nelson the Cutter." The heroin distributed by the Unknown Organization was highly desirable to drug users because it was among the purest and most potent available in the New York area, being about 50 percent pure.

After the heroin was cut, it was transported to various "mills" where it was diluted and placed in glassine bags by dozens of sometimes nude and masked workers. The glassine bags were placed in commercial egg crates and then sent to assorted "retail establishments," known as "spots" in various Brooklyn locations. Extensive and detailed records were kept by the Unknown Organization with regard to each operation, with specific amounts, names of participants and expenses involved in each operation. The Unknown Organization enforced its operation, warded off competition and prevented stealing by its own members, by intimidation, torture and murder.

As stated above, the Unknown Organization was headed by Melendez, who was assisted by a number of "lieutenants," who were in charge of particular areas of the operation such as cutting, packaging, distribution and protection. One of these lieutenants was the petitioner, Manuel Concepcion. Each lieutenant received a percentage of the sales of the drugs in which he was involved. The petitioner was in charge of drug distribution in Williamsburg, Brooklyn. Following the arrest of Melendez on September 24, 1988, Concepcion became the leader of the entire Unknown Organization and received the money from all drug sales.

Concepcion was the leader of the Unknown Organization until his arrest on March 14, 1989, during an abortive purchase by him and others from a confidential informant of more than seven kilograms of pure heroin, at a price of more than one million dollars. At the time of his arrest, Concepcion was in possession of more than one million dollars in cash, an Uzi submachine gun and two handguns.

### II. *THE TRIAL*

Without stating all the details of this notable four-month trial of ten defendants for a multitude of drug and violent crimes, the Court will note some important aspects.

The narcotics records seized in a raid of an apartment in Brooklyn, in which the

police seized $156,000 in cash and 12,000 glassines of heroin, revealed a vast narcotics distribution organization. The Unknown Organization did business at a multitude of locations in Brooklyn, Queens and the Bronx. To protect their extensive drug operation, many weapons were purchased in Texas and transported to New York.

The Organization protected their vast and profitable narcotics business with brutal acts of violence against competitors and wayward organization members. These violent acts included severing the finger of member Todd Middleton, who had been accused of stealing from customers of the Organization. On another occasion, Middleton was kidnapped, stabbed more than 100 times with an icepick and beaten senseless. Concepcion, himself, shot to death James Gines, a friend of a rival. When asked why he did the killing himself, Concepcion responded, "I'm that type of guy, I like to take care of my own actions." (Tr. at 9331).*

A worker named "Re–Run" who stole money while selling heroin at an Organization spot was shot five times in the leg. George Espada, who stole $100,000 in drug money from the Organization, was beaten, shot in the leg and stabbed in the gunshot wound. Rival Santo Rivera was shot in the head, causing permanent brain damage. Rademus Rivera, a worker who stole money from the Organization was stabbed to death. Competitor Robert Aponte was shot six times at close range and killed in a local bodega. There was also evidence adduced at the trial of beatings of workers and an attempted murder of a police officer.

Ten defendants were tried before this Court commencing on August 23, 1990 and resulted in a jury verdict convicting all but one defendant on December 23, 1990. During the trial, the Government called approximately 84 witnesses, including 12 accomplices. The jury convicted Concepcion of the following crimes:

Count 1/RICO violation (18 U.S.C. § 1962(c)).

Count 2/1st Racketeering Act—Conspiring to distribute and to possess with intent to distribute in excess of one kilogram of heroin and five kilograms of cocaine (21 U.S.C. §§ 845 and 841(b)(1)(A)).

Count 8/7th Racketeering Act—Kidnaping and beating George Estrada.

Count 15/11th Racketeering Act—Money Laundering.

Count 17/13th Racketeering Act—Murder of James Gines.

Count 19: Committing an assault with a dangerous weapon in aid of racketeering activity (18 U.S.C. § 1952B(a)(3?)).

Count 21/15th Racketeering Act—Kidnaping and assault in aid of racketeering activity (18 U.S.C. § 1952B(a)(1)).

Count 25/16th Racketeering Act—Using proceeds of drug trafficking to purchase automobiles on November 12, 1987, February 22, 1988 and October 11, 1988.

Count 28/19th Racketeering Act—Murder of Roberto Aponte.

Count 30/20th Racketeering Act—Attempting to possess with intent to distribute in excess of one kilogram of heroin (21 U.S.C. §§ 846 and 841(b)(1)(A)).

Count 31: Using and carrying a firearm during and in relation to a drug trafficking crime (18 U.S.C. § 924(c)(1)).

On March 22, 1991, this Court sentenced Concepcion to a term of life imprisonment plus a mandatory consecutive five-year

---

* Tr. refers to the trial transcript.

term, a mandatory five-year supervised release term, a fine of $1,000,000, and a special assessment of $550.

## III. *THE APPEAL*

On appeal, Concepcion contended that (1) the Court improperly restricted cross-examination on Government witness Victor Jiminez, (2) the Court improperly admitted testimony concerning Concepcion's offer to commit murder, (3) the Government changed its theory of the case from opening to summation, (4) the evidence was insufficient to establish Concepcion's commission of the Gines murder, (5) the identification of Concepcion by two witnesses as a participant in the Gines murder was tainted, and (6) the evidence was insufficient to establish that the commission of the two assaults charged in Count Nineteen was to maintain or increase Concepcion's position in the racketeering enterprise. The Second Circuit rejected all of Concepcion's claims and affirmed all his convictions. *United States v. Concepcion,* 983 F.2d 369 (2d Cir.1992), *cert. denied,* 510 U.S. 856, 114 S.Ct. 163, 126 L.Ed.2d 124 (1993).

## IV. *THE PETITION*

In a petition filed on April 23, 1997, Concepcion moved, pursuant to 28 U.S.C. § 2255 to vacate, set aside or correct his sentence. The grounds listed by the petitioner are as follows:

Ground one: The conviction under 18 U.S.C. § 924(c) must be vacated due to the Bailey decision. "There is no evidence that Concepcion 'used' a firearm in the course of a narcotics transaction. Weapons were in trunk of another car 50 feet from Concepcion's automobile."

Ground two: "The government knowingly suppressed exculpatory evidence and knowingly presented a false scenario with regard to the killing of James Gines. Also the Government misrepresented the rec-

ord regarding that killing during arguments on Rule 29 motion."

Ground three: "The government's summation was replete with vouching pleas to the almighty, invented testimony, personal opinions and improper remarks."

Ground four: "Concepcion was denied his right of confrontation when a co-defendant's 'redacted' summation was used against him. The prosecutor 'filled in the blanks' from the redaction while cross-examining a co-defendant (not the maker of the statement) and during closing arguments. It was also used to bolster the testimony of other prosecution witnesses."

Ground five: "Concepcion was denied the right to testify in his own defense ... Despite the fact that Concepcion requested that his attorney put him on the witness stand, the attorney did not, and rested the defense case without calling any witnesses."

Ground six: Ineffective assistance of trial and appellate counsel. In that (a) "Counsel failed to challenge the facial composition of the jury venire, which contained only one Hispanic, who was excused, and no Asians", (b) "Counsel was ineffective in defending Concepcion on the Gines murder," and (c) "Counsel failed to request a special verdict with regard to the duel-objective conspiracy and the quantities of heroin for which Concepcion was liable at sentencing."

Ground seven: "The case must be remanded for resentencing because the Court made no findings of fact with regard to the quantities of drugs for which Concepcion was liable."

In the petition, Concepcion acknowledged that he had not previously presented the ineffective assistance of counsel ground. His reason for not previously presenting this ground was (1) Govern-

ment misconduct and (2) an intervening change of the law.

The Court will address each of the grounds in the petition, in order.

## V. DISCUSSION

### A. Standard of Review

As stated by the Second Circuit "[b]ecause requests for habeas corpus relief are in tension with society's strong interest in the finality of criminal convictions, the courts have established rules that make it more difficult for a defendant to upset a conviction by collateral, as opposed to direct, attack." *Ciak v. United States*, 59 F.3d 296, 301 (2d Cir.1995) (citing *United States v. Frady*, 456 U.S. 152, 165, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982)). As a result, prisoners seeking habeas corpus relief pursuant to Section 2255 must show both a violation of their constitutional rights and "substantial prejudice" or a "fundamental miscarriage of justice." *Ciak*, 59 F.3d at 301.

■ Further, in Section 2255 proceedings, the Supreme Court has recognized the rule of "procedural default: [that prisoners] cannot assert claims they failed to raise at trial or on direct appeal unless they can show 'cause' for the default and 'prejudice' resulting from it." *Id.* at 302 (citing *Wainwright v. Sykes*, 433 U.S. 72, 87, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977)); *see also Reed v. Farley*, 512 U.S. 339, 114 S.Ct. 2291, 129 L.Ed.2d 277 (1994). The general rule is that a writ of habeas corpus is not a substitute for an appeal. "Where the petitioner—whether a state or federal prisoner—failed properly to raise his claims on direct review, the writ is available only if the petitioner establishes 'cause' for the waiver and shows 'actual prejudice from the alleged ... violation.'" *Id.* at 354, 114 S.Ct. 2291 (citing *Wainwright*, 433 U.S. at 84, 97 S.Ct. 2497).

■ However, the traditional procedural default rule generally will not apply to ineffective assistance of counsel claims where a petitioner was represented by the same attorney at trial and on direct appeal and where such claims depend on matters outside the scope of the record of a direct appeal. *Billy-Eko v. United States*, 8 F.3d 111, 114 (2d Cir.1993). *Billy Eko* added that, "ineffective assistance of counsel claims are appropriately brought in § 2255 petitions even if overlooked on direct appeal because resolution of such claims often requires consideration of matters outside the record on direct appeal...." *Id.* (citation omitted). Thus, ineffective assistance of counsel claims may be raised for the first time in a habeas petition. *See United States v. Matos*, 905 F.2d 30, 32 (2d Cir.1990). Therefore, while the petitioner did not raise an ineffective assistance counsel claim on direct appeal, the Court is required to examine the merits of such a claim under section 2255.

To establish an ineffective assistance of counsel claim, the petitioner must "show that counsel's representation fell below an objective standard of reasonableness." *Strickland v. Washington*, 466 U.S. 668, 688, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Moreover, the petitioner must show that the "deficient performance prejudiced the defense." *Id.* at 687, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674. In order to show prejudice, the petitioner must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *United States v. Caputo*, 808 F.2d 963, 967 (2d Cir.1987) (quoting *United States v. Cruz*, 785 F.2d 399, 405 (2d Cir.1986)). The Court's determination, however, must be highly deferential to counsel as, "[i]t is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sen-

tence." *Id.* at 689, 104 S.Ct. 2052. While the Court must presume that counsel's conduct was reasonable, the Court nonetheless is mindful that the petitioner is proceeding *pro se* and thus, his submissions will be liberally construed. *See Douglas v. United States,* 13 F.3d 43, 47 (2d Cir.1993).

### B. *The "Bailey" Firearm Issue*

■ The incident that gave rise to the Section 924(c) charges arose during the arrest and search of the petitioner and others on March 14, 1989. This was during a reverse sting operation in which Concepcion was attempting to purchase more than seven kilograms of heroin. Concepcion contends that he was arrested "while standing astride his Ford van" while two other perpetrators were seated in a 1988 Cadillac parked 50 yards from Concepcion. In the trunk of the Cadillac were two .25 caliber handguns and one 9 millimeter Uzi.

At the close of the Government's case, counsel moved for a judgment of acquittal on the Section 924(c) charge on the ground that the Government failed to prove that Concepcion "used" or "carried" a firearm during and in relation to a drug trafficking crime. The Court denied the motion and later instructed the jury that the necessary elements of conviction in the Section 924(c) charge were:

> THE COURT: The term "uses a firearm" means having a firearm or firearms available to assist or aid in the commission of the crime alleged in Count two of the indictment, the alleged narcotics conspiracy as to defendants Melendez, Frias and Maldonado, and the crime alleged in Counts 2 and 30 of the indictment as to defendant Concepcion. In determining whether the defendant used a firearm in this regard, you may consider all the factors received in evidence in this case, including the nature of the underlying crimes of drug trafficking alleged, the proximity of the defendant to the firearm in question, the usefulness of the firearm to the crime alleged, and the circumstances surrounding the presence of the firearm. Again, the government is not required to show that the defendant actually displayed or fired the weapon. The government is required, however, to prove beyond a reasonable doubt that the firearm was in the defendant's possession or under the defendant's control at the time that the drug trafficking crime was committed.

Tr. at 11723–24.

In *Bailey v. United States,* 516 U.S. 137, 116 S.Ct. 501, 508, 133 L.Ed.2d 472 (1995), the Court held that the "use" requisite of Section 924(c) requires evidence of "active employment of the firearm by the defendant, a use that makes the firearm an operations factor in relation to the predicate offense". The Court further held that unless the defendant brandished, displayed, made reference to, struck with, fired, attempted to fire, or bartered a gun during the conviction he cannot be convicted under Section 924(c). *Id.* at 508. Further the Court stated that:

> [A] defendant cannot be charged under Section 924(c)(1) merely for storing a weapon near drugs or drug proceeds. Storage of a firearm without active employment, is not reasonably distinguished from possession. *Id.* at 508

In sum, Concepcion contends that the evidence proves that he did not brandish, display, make reference to, strike with, fire, attempt to fire, or barter a gun during the transaction. Therefore, he asserts his conviction under Section 924(c) must be reversed.

In response, the Government contends that Concepcion's Section 924(c) conviction

is still valid. First, the Government states that, at the March 14, 1989 abortive drug transaction, the weapons were located in the car Concepcion arrived in. Second, the Government contends that this claim is procedurally barred for failure to raise it on direct appeal, unless Concepcion can establish actual innocence. *Murray v. Carrier,* 477 U.S. 478, 496, 106 S.Ct. 2639, 2649–50, 91 L.Ed.2d 397 (1986). Further the Government contends that, as Concepcion admits, the superseding indictment charged him with both using *and* carrying a firearm in connection with drug trafficking, and the jury was charged as to both acts:

As to these . . . counts, namely, . . . 31 . . ., the government must prove each of the following elements beyond a reasonable doubt in order to convict.

First, that on or about the date charged, the defendant was carrying or used a firearm.

Second, that the defendant had knowledge that what he was carrying or using was a firearm; and

\*　　\*　　\*　　\*　　\*　　\*

Third, that he did so during and in relation to the commission of a drug trafficking crime for which he might be prosecuted in a Court of the United States.

What do we mean by carrying or use of a firearm.

The first element the government must prove beyond a reasonable doubt is that the defendant was carrying or used a firearm.

You will note that there are two types of conduct set forth in the statute.

One, is carries a firearm, and the other is uses a firearm. I will now define these terms.

As to carry, very simply. The word can be used in its literal everyday meaning.

\*　　\*　　\*　　\*　　\*　　\*

The government further charges in count 31 that the defendant Manuel Concepcion unlawfully used and carried the firearms during and in relation to (1) a conspiracy to possess with intent to distribute heroin and cocaine as alleged in count two and, (2) in relation to an attempted to possess with intent to distribute heroin on March 14, 1989, as is alleged in Count 30.

Tr. at 11722–25.

The Government correctly states that even if the evidence does not sufficiently establish a "use" of the firearm, as that term is described in *Bailey,* it does sufficiently prove a "carry." In *Muscarello v. United States,* 524 U.S. 125, 118 S.Ct. 1911, 141 L.Ed.2d 111 (1998), decided after *Bailey,* the Supreme Court held that a situation where the defendants had guns in either a locked glove compartment or the trunk of a car, at the time of a drug transaction, established that the guns were being "carried." The Court further stated that "neither the statute's basic purpose nor its legislative history support circumscribing the scope of the word 'carry' by applying an 'on the person' limitation." *Id.* 132–33, 118 S.Ct. 1911, 118 S.Ct. at 1916. As stated by the Supreme Court:

Given the ordinary meaning of the word "carry," it is not surprising to find that the Federal Circuit Courts of appeals have unanimously concluded that "carry" is not limited to the carrying of weapons directly on the person but can include their carriage in a car.

\*　　\*　　\*　　\*　　\*　　\*

In sum, the 'generally accepted contemporary meaning' of the word 'carry' includes the carrying of a firearm in a

vehicle. The purpose of this statute warrants its application in such circumstances. The limiting phrase 'during and in relation to' should prevent misuse of the statute to penalize those whose conduct does not create the risks of harm at which the statute aims. *Id.* at 131, 139, 118 S.Ct. at 1916, 1919.

In this case, the evidence clearly established that Concepcion was "carrying" firearms in connection with the seven kilogram heroin transaction that formed the basis of his March 14, 1989 arrest. The guns were in the trunk of the car in which he came to the scene. Under the specific language of *Muscarello,* by reason of the established fact that the guns were in the trunk of the car near where Concepcion was standing in the midst of a major drug deal, he was properly convicted of "carrying" those weapons. Accordingly, the petitioner's Section 924(c) claim is denied.

### C. *The Gines Murder Issues*

■ Concepcion next contends that his conviction under Count 17 of the indictment must be vacated. This count involves a charge of violation of 18 U.S.C. Section 1959(a)(1) (a violent crime in aid of racketeering activity) in connection with the murder of James Gines. In particular, the petitioner questions the proof of the fifth element needed for such a conviction, namely, that the motive for the murder was to maintain or increase Concepcion's position in the Unknown Organization criminal enterprise. Concepcion contends that "the government suppressed exculpatory evidence, and knowingly presented the jury with a false scenario in order to convey to the jury the impression that the murder of James Gines was committed in aid of racketeering." Also, the petitioner complains that the prosecutor took the testimony about the Gines murder "out of context in order to present a false scenario to the jury . . . to give the jury the belief that Gines' death was in aid of racketeering." In sum, Concepcion contends that the Gines murder was not related to maintaining or increasing Concepcion's position in the Unknown Organization enterprise, and thus, the evidence was insufficient to sustain a conviction on Count 17.

As stated above, the petitioner contends that the Government suppressed certain exculpatory evidence that would prove that the Gines murder had nothing to do with the Unknown Organization enterprise. This evidence consisted of interviews of ten to fifteen witnesses who allegedly failed to tie the incident to drug activity. In addition, Concepcion accused the trial prosecutor of lying to the Court about this "false scenario." *See Mooney v. Holohan,* 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791 (1935). In this vein, Concepcion contends that the prosecutor failed to turn over interview notes of four witnesses, two of whom testified.

Finally, Concepcion asserts that after interviewing fifteen witnesses to the Gines murder, and all the debriefings, "not one witness testified . . . that a drug spot existed on or near the location of the Metropolitan Avenue (Gines) shootout" and that this was Brady material that should have been disclosed.

The Government responds that it did not withhold exculpatory evidence nor did it present a false scenario with regard to the Gines murder. Further, the Government contends it did comply with its Brady obligations. In particular, it did turn over prior statements by Adam Pomales and Juan Rivera, two witnesses who testified. Also, it turned over statements of some potential witnesses who did not testify, namely, Felix Oyola and Kenneth Colon, who were two of the participants in the Gines murder. In addition, the Government turned over statements of other wit-

nesses to the Gines murder, in the form of police reports. Further, the Government disputes the petitioner's conclusory assertion that it had exculpatory interviews of fifteen other witnesses to the Gines murder.

Moreover, the Government points out that two of the witnesses named by the petitioner pled guilty to the same Section 1959 charge. Their allocutions do not support the petitioner's contention that the motive for the Gines murder did not maintain or increase Concepcion's position in the criminal enterprise. Nor is there any evidence that any of the eyewitnesses to the murder except for one Babon, had any information about the reasons for the shootout, which is the issue now being raised by Concepcion.

After reviewing the record, the Court finds that the Government adduced sufficient evidence to prove the Section 1959(a)(1) violation in connection with the Gines murder. In addition, the Court finds no Brady violation in regard to this incident. The record reveals no evidence of any exculpatory evidence that was withheld from Concepcion or any of the other defendants at the trial. For example, as to witness Adam Pomales, the record reveals that the defense was furnished with his grand jury testimony as well as records of his debriefing by Government agents.

(Cross-examination by counsel for defendant Melendez):

> Q You recognize that document as a summary of what you told those people at that time, on September 21, 1989.
> Is that right?
>
> * * * * * *
>
> Q Okay.
> Have you ever seen any writing or any report or any memorandum that has what you say you told them, that is specifically, that there was a phone call

implicating Rick Melendez at that time and place? Have you ever seen anything like that?

> A No, I just talked.
>
> Q Okay.
>
> A They asked questions and I answered them.
>
> Q Then you went into the Grand Jury the same day, isn't that right?
>
> A I guess so, yeah.
>
> Q And you were asked questions about the same subject matter, basically, right?
>
> A Yes.
>
> Q Okay.
>
> * * * * * *
>
> Q All right.
> The fact of the matter is you were asked those questions and gave those answers under oath in September of 1989.
> Is that right?
>
> A Yes.

Tr. at 9464–65, 9468.

In addition, the record shows that Juan Rivera's prior statements were revealed to the defense. See Tr. 6438–40, 6458–61, 6464–65, 6479–82. For example, in the cross-examination of Rivera by Concepcion's attorney, the following occurred:

> Q You don't remember saying that?
>
> A I don't remember saying that.
>
> Q Well, let me show you what is identified as 3500–3500–2056–B.
>
> MR. GINSBERG: Page, please?
>
> MR. FUTERFAS: Yes. 32.
>
> MR. GINSBERG: Judge, could we have the whole sentence read if Mr. Futerfas is going to read part of it, please?
>
> THE COURT: Is not going to—

MR. FUTERFAS: May I choose to conduct my cross-examination in the way I see fit, Your Honor?

THE COURT: Yes.

MR. GINSBERG: Judge, Mr. Futerfas took in quotations a couple of words out of context.

\* \* \* \* \* \*

THE COURT: Well, let me see the paper you are quoting from.

MR. FUTERFAS: Very well. It is the top paragraph, page 30—page 32.

(Document to court.)

THE COURT: Overruled.

Tr. at 6479–80.

Also, with regard to potential witnesses who did not testify, namely, Felix Oyola and Kenneth Colon, two of the participants in the Gines murder, the record reveals that the Government turned over their statements. See Tr. at 9783–84, 9963–66. Further, the Government turned over statements of other witnesses to the events in the Gines murder, in the form of police reports.

The petitioner's claim that the Government failed to turn over exculpatory interviews of fifteen witnesses to the Gines murder, is also unsubstantiated. Such a conclusory assertion will not suffice to support this petition or even to compel a hearing. *United States v. Aiello*, 814 F.2d 109, 113 (2d Cir.1987). *See also United States v. McGill*, 11 F.3d 223, 225 (1st Cir.1993) (in determining whether hearing on petition required, "the court need not give weight to conclusory allegations, self-interested characterizations, discredited inventions, or opprobrious epithets").

Concepcion now offers various reasons for the Gines murder. One such theory is in his memorandum of law in support of his petition (pp. 18–19), having to do with an altercation between Babon and four armed Hispanic men over girls on the block, causing a chase, leading to the Gines murder. In addition, the September 1997 affidavit of attorney Ruth Liebesman offers a different scenario. She asserts that she received a telephone call from Felix Oyola, who was never called as a witness, informing her that "the death of James Gines had nothing to do with anything drug related." In this version Babon was chased because he pulled a weapon when a group of men tried to take his bike. This version is supported by an October 29, 1998 affidavit by Felix Oyola, who stated that the fatal fracas started when "some men ... wanted to take his motorcycle," at which time Babon pulled a gun. The Court notes that this version by Oyola is a different description of the events of the Gines murder than the one recounted by him during his plea allocution.

■ The Court must treat this erstwhile recantation with caution. A plea allocution given in open court under oath carries a strong presumption of credibility. *Blackledge v. Allison*, 431 U.S. 63, 74, 97 S.Ct. 1621, 1629, 52 L.Ed.2d 136 (1977). Here, even if Oyola had testified at the trial and later recanted his testimony, the petitioner would have a difficult burden. Courts are particularly reluctant to grant motions for a new trial where the newly discovered evidence consists of a witness recantation, as such actions are looked upon with the utmost suspicion. *United States v. Gallego*, 191 F.3d 156, 166 (2d Cir.1999); *United States v. DiPaolo*, 835 F.2d 46, 49 (2d Cir.1987); *United States ex rel. Sostre v. Festa*, 513 F.2d 1313, 1318 (2d Cir.) (quoting *United States v. Troche*, 213 F.2d 401, 403 (2d Cir.1954)).

■ Accordingly, before granting a motion for a new trial on the ground that a witness recanted his trial testimony, a trial court must be satisfied (1) that the testimony recanted was false and material,

*Sostre,* 513 F.2d at 1317; *United States ex rel. Rice v. Vincent,* 491 F.2d 1326, 1331 (2d Cir.), *cert. denied,* 419 U.S. 880, 95 S.Ct. 144, 42 L.Ed.2d 120 (1974); and (2) that without the original testimony the jury probably would have acquitted the defendant, *United States v. Alessi,* 638 F.2d 466, 479 (2d Cir.1980); *U.S. v. Stofsky,* 527 F.2d 237 (2d Cir.1975). Here, there is no testimony to be recanted, because Oyola did not testify. Moreover, there was no allegation of perjury committed by witnesses to the Gines murder during the trial. Further, Oyola's prior plea allocution would be difficult for him to overcome, even if he were to be a witness.

A review of the record also reveals that, except for Babon, the other potential witnesses were eyewitnesses only to the event and had no information about the reasons for the shootout, which is the issue raised by the petitioner. Therefore, even assuming that the Government had in its possession and failed to turn over the statements of other witnesses, it cannot be said that this evidence "could reasonably ... put the whole case in a different light as to undermine confidence in the verdict." *Kyles v. Whitley,* 514 U.S. 419, 435, 115 S.Ct. 1555, 1566, 131 L.Ed.2d 490 (1995). Further and significantly, the jury's verdict on this count was amply support by other evidence. *United States v. Gallego,* 191 F.3d 156 (2d Cir.1999).

### D. *As to the Prosecution Summation*

Concepcion asserts that his convictions on counts 17 and 28 (the Gines and Aponte murders) "must be set aside as a result of the cumulative effects of the prosecutor's many improper remarks during summation." Concepcion argues that these alleged improper remarks by the prosecutor deprived him of his rights to a fair trial; to due process under the Fifth Amendment; of the right to face his accusers under the Sixth Amendment; and his right to effective assistance of counsel. Among the many asserted claims of an improper summation by the prosecutor are the follows:

1. The prosecutor vouched for the credibility of his witnesses and implied that the Court did the same:

> Don't believe for a second that Judge Spatt or any judge wants to hear anything but the truth.... The Judge may warn you that certain people are guided by personal concerns when they testify, but the only incentive that those witnesses have is to tell the truth so that this Court believes that the (sic) recognize and that they have admitted their crimes. Tr. at 10777–78.

2. The prosecutor "sought to invoke the name of the Almighty into the fray in order to appeal to the jury's emotions."

> And you saw the cover, the cover of the baby carriage with bullet holes in it and thank G-d, ladies and gentlemen, thank G-d a bullet in Concepcion's arm finally stopped him. Tr. at 10851.

3. The prosecutor made a "further emotional plea" with regard to Gines' surviving family members.

> Long after this trial is over and your deliberations are complete, will it ever be possible to forget Lea Lopez, the woman who says Concepcion shot her boyfriend once in the front and twice in the back, who stared and uttered in absolute fright as that man sitting over there took aim at her baby. Tr. at 10859.

4. The prosecutor stated that Concepcion was "armed as he always was" and he "lied to the police" with regard to the holster he was carrying.

5. The prosecutor accused Quirk, the defense ballistics expert, "of offering testimony for sale."

[l]et me briefly mention Mr. Quirk, the expert ... for a hundred bucks an hour Mr. Quirk would just about say anything. Tr. at 10818.

6. The prosecutor stated that Concepcion was already behind bars.

A little later Aponte, Concepcion ... were arrested, this drug organization ... was finally behind bars. Tr. at 10826.

7. The prosecutor referred to the defendants as "a parasite feeding on the frailties and vulnerability of people." Tr. at 10836.

8. Throughout his summation the prosecutor repeatedly voiced his opinion that Concepcion was guilty.

9. The prosecutor improperly commented on Concepcion's failure to testify, with regard to the Espada beating.

Do you recall Mr. Futerfas asking Espada during cross-examination whether the beating was a laughing matter? If only someone had asked Mr. Futerfas' client that question.... Tr. at 10855.

10. The prosecutor misused an out-of-court statement of Roberto Aponte (a.k.a."Savage") which allegedly was made to DEA agents after Aponte's arrest. The petitioner contends that Aponte's out-of-court statement was used to link him to the reverse sting of March 14, 1989 in violation of *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), because the prosecutor "filled in the blanks" of the redacted statement.

In sum, Concepcion contends, based on all these improper statements in the prosecutor's summation, that the jury was "led astray under the totality of the circumstances" regarding the Gines and Aponte murder incidents, which also tainted the RICO charges (*see Floyd v. Meachum*, 907 F.2d 347, 356 (2d Cir.1990)). Thus, petitioner asserts that, based on this summa-

tion issue, he "is entitled to a new trial in toto."

■ Initially, the Court notes that the Concepcion summation claims appear to be procedurally barred. These claims could and should have been raised on appeal by appellate counsel. *See United States v. Munoz*, 143 F.3d 632, 637 (2d Cir.1998) ("a motion under Section 2255 is not a substitute for an appeal"); *United States v. Pipitone*, 67 F.3d 34, 38 (2d Cir.1995) ("A party who fails to raise an issue on direct appeal and subsequently endeavors to litigate the issue via a Section 2255 petition must 'show that there was cause for failing to raise the issue, and prejudice resulting therefrom.' ") (quoting *Douglas v. United States*, 13 F.3d 43, 46 (2d Cir.1993)); *Billy–Eko v. United States*, 8 F.3d 111, 113–14 (2d Cir.1993) ("It is well-settled that where a petitioner does not bring a claim on direct appeal, he is barred from raising the claim in a subsequent Section 2255 proceeding unless he can establish both cause for the procedural default and actual prejudice resulting therefrom.")

Concepcion has failed to show cause for this default and he cannot now seek review of these summation issues. However, to complete the record, the Court will address the merits of the petitioner's contentions. As will be seen, Concepcion also did not demonstrate sufficient prejudice resulting from the prosecutor's remarks at summation so as to excuse his failure to raise this ground on appeal.

■ The Supreme Court has established the rules governing the collateral review of a prosecutor's improper remarks on summation. A criminal conviction "is not to be lightly overturned on the basis of a prosecutor's comments standing alone" in an otherwise fair proceeding. *United States v. Young*, 470 U.S. 1, 11, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985). In order to

reach the level of a constitutional violation, a prosecutor's remarks must "so infect [ ] the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo,* 416 U.S. 637, 643, 94 S.Ct. 1868, 1871, 40 L.Ed.2d 431 (1974); *Darden v. Wainwright,* 477 U.S. 168, 181, 106 S.Ct. 2464, 2466–67, 91 L.Ed.2d 144 (1986); *Garofolo v. Coomb,* 804 F.2d 201, 206 (2d Cir.1986). Prosecutorial misconduct during summation is grounds for reversal only when the remarks caused "substantial prejudice" to the defendant. *United States v. Tutino,* 883 F.2d 1125, 1136 (2d Cir.1989), *cert. denied,* 493 U.S. 1081, 110 S.Ct. 1139 (1990); *United States v. Nersesian,* 824 F.2d 1294, 1327 (2d Cir.), *cert. denied,* 484 U.S. 957, 108 S.Ct. 355, 98 L.Ed.2d 380 (1987).

However, with regard to the concept of "harmless error," in *Brecht v. Abrahamson,* 507 U.S. 619, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993) the Supreme Court clarified that a different "harmless error" standard applies when a federal court conducts a habeas review of a conviction—a form of collateral review—than when the conviction is subject to direct review by the federal court. In pertinent part, the Supreme Court stated:

In *Chapman v. California* … we held that the standard for determining whether a conviction must be set aside because of federal constitutional error is whether the error "was harmless beyond a reasonable doubt." In this case we must decide whether the *Chapman* harmless-error standard applies in determining whether … [prosecutorial misconduct] entitles petitioner to habeas corpus relief. We hold that it does not. Instead, the standard for determining whether habeas relief must be granted is whether the … error "had substantial and injurious effect or influence in determining the jury's verdict."

*Id.* 507 U.S. at 622–23, 113 S.Ct. at 1713–14 (quoting *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967), *Kotteakos v. United States,* 328 U.S. 750, 776, 66 S.Ct. 1239, 1253, 90 L.Ed. 1557 (1946)) (other citations omitted).

In *Brecht,* the Supreme Court also reaffirmed the distinction between two broad types of constitutional violations that may occur in a criminal trial: structural error and trial error. A "structural error" requires automatic reversal and is not subject to harmless error analysis because it involves a deprivation of a constitutional protection so basic that in its absence, " 'a criminal trial cannot reliably serve its function as a vehicle for determination as fundamentally fair.' " *Arizona v. Fulminante,* 499 U.S. 279, 310, 111 S.Ct. 1246, 1265, 113 L.Ed.2d 302 (1991) (citations omitted), *reh'g denied,* 500 U.S. 938, 111 S.Ct. 2067, 114 L.Ed.2d 472 (1991). On the other hand, a "trial error" is one which occurred during the presentation of the case to the jury and, as such, may be quantitatively assessed in the context of other evidence presented to determine whether it was harmless. *Brecht,* 507 U.S. at 629, 113 S.Ct. at 1717. The asserted summation errors in this case were of the trial type and, therefore, the Court will assess their effect under the *Brecht* standard.

In sum, applying the rule, in order to be entitled to habeas relief, Concepcion must demonstrate that he suffered actual prejudice because the prosecutor's comments during summation had a substantial and injurious effect or influence in determining the jury's verdict. Habeas relief is not appropriate when there is merely a "reasonable possibility" that trial error contributed to the verdict. *Brecht,* 507 U.S. at 636–37, 113 S.Ct. at 1721 (internal quotation omitted).

■ Applying these rules to the prosecutor's comments in summation at issue here, the Court finds that the so-called improper comments are insufficient to reverse any of the Concepcion convictions. First, some of Concepcion's contentions are unsupported by the record. Further, the prosecutor had a right to accuse Concepcion of lying to the police when questioned about the shootout at the hospital on May 12, 1988. Also, based on the eye-witness testimony, the prosecutor had a right to accuse Concepcion of having shot Gines. In addition, Aponte's redacted statement was used with regard to Aponte's involvement in the crimes, rather than that of Concepcion.

Finally, to the extent some of the prosecutor's statements are arguably improper, such as the comments involving the Court in determining the credibility of witnesses, or invoking the Almighty, or disparaging the defendant's expert, in no way could they have "had a substantial or injurious effect or influence in determining the jury's verdict." The proof of Concepcion's guilt as to counts 17 and 28, as well as the other counts for which he has been convicted, is overwhelming. *See Young*, 470 U.S. at 16, 105 S.Ct. at 1047 (they did not "undermine the fundamental fairness of the trial").

The Court finds that Concepcion has failed to demonstrate either cause for his failure to raise this ground on appeal or prejudice as a result of the prosecutor's comments in his summation. Moreover, any transgression by the prosecutor in his summation, constitutes harmless error, as a matter of law.

### E. *The Bruton Issue*

Over defense objections, the Court admitted a redacted statement from Roberto Aponte. The statement was redacted to remove the names of the co-conspirators, including Concepcion. Adam Pomales, a cooperating witness, testified that Roberto Aponte (also known as "Savage") appeared at the Hot Rods Garage, owned by Concepcion, and stated that Robert Aponte (a different person named Aponte) was "slick" and had gotten away. Later, according to Pomales, Concepcion arrived at the garage and gave "Savage" a gun. Savage stated that "it will be done today," and Fernando Alvarez asked for and received permission from Concepcion to go with Savage. According to Pomales, after hearing that Aponte was dead, Pomales, Savage, Alvarez and Concepcion met to celebrate, and Concepcion gave Savage $10,000 and a Rolex watch. Alvarez was given $1,000.

Concepcion contends that, "Without bolstering evidence, and in light of the impeachment of Pomales, Concepcion's complicity in this killing was not established beyond a reasonable doubt." Further, Concepcion contends that the redacted statement by Roberto Aponte "bootstrapped Pomales' testimony and filled in the gaps in Pomales' testimony" and was "devastating ... yet immune from cross-examination." Also, Concepcion contends that the Government impeached Marc Ramirez, a testifying co-defendant, with Aponte's statement in a manner that implicated the petitioner.

In opposition, the Government sets forth the entire redacted statement of Roberto Aponte dated March 14, 1989 (Govt Ex. 30–16–A). This statement is annexed to the opinion and designated as Appendix A.

Again, the petitioner could have raised this record-based claim on appeal but failed to do so. The petitioner showed neither cause for nor prejudice from his failure to raise this claim and it is procedurally banned. *Campino* v. *United States,* 968 F.2d 187 (2d Cir.1992). How-

ever, to complete the record, the Court will address the merits of this *Bruton* claim.

The Sixth Amendment guarantees a defendant's right to cross-examine witnesses. *Bruton v. United States*, 391 U.S. 123, 126, 88 S.Ct. 1620, 1622–23, 20 L.Ed.2d 476 (1968). In particular, *Bruton* held that in a joint trial, the confession of one co-defendant—which implicates both defendants—may not be introduced despite the court's limiting instruction that the confession be considered only against the confessing defendant. *Id.* at 128, 88 S.Ct. at 1623–24. The *Bruton* rule was limited somewhat in *Richardson v. Marsh*, 481 U.S. 200, 211, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987), where the Supreme Court held that the Sixth Amendment is not violated where the nontestifying co-defendant's confession is admitted with a limiting instruction, if the confession is redacted to eliminate both the defendant's name and any reference to his or her existence. *Id.*

In the succession of cases after *Bruton*, the rule has been further refined. Today, the Court can admit a non-testifying co-defendant's confession if the statement is appropriately redacted to exclude any reference to the defendant, and the statement does not clearly implicate the defendant. *Gray v. Maryland*, 523 U.S. 185, 196–96, 118 S.Ct. 1151, 1157, 140 L.Ed.2d 294 (1998); ("we concede that *Richardson* placed outside the scope of *Bruton's* Rule those statements that incriminate inferentially"). *Richardson*, 481 U.S. at 208, 107 S.Ct. at 1707–08. *See also United States v. Smith*, 198 F.3d 377, 385 (2d Cir.1999) ("In addition, the plea allocution was not incriminating on its fact because it did not directly implicate Smith. Therefore, we find no violation of Gray").

■ A review of the redacted Aponte statement reveals that the Court eliminated all references that could point to Concepcion. Not only were all names deleted but all specific locations were removed. The Court agrees with the Government that "it is highly unlikely that the redacted statement in any way implicated Concepcion inasmuch as it is replete with so many pronouns as to make it virtually impossible even to guess the proper names of the individuals being spoken about." The Court adheres to its statement made at the trial at the time of the statement's admission (Gov't Opposition Brief at pp 41–42):

> THE COURT: The statement doesn't point the finger at anybody. It's specifically within the exception to Bruton even as extended by Cruz. [It] Does not say anything about anyone in this case. There are also sufficient number of defendants here and sufficient number of actors in this transaction that no one person is pointed out by this statement. That is under Richardson against Marsh.

■ Moreover, even if the statement was improperly received in evidence, in no way did this error contribute to the guilty verdicts. A confrontation clause violation is subject to a harmless error analysis. Any such error is harmless, when the Court is able to "declare a belief that it was harmless beyond a reasonable doubt." *Chapman v. California*, 386 U.S. 18, 26, 87 S.Ct. 824, 829 (1967), *see also Harrington v. California*, 395 U.S. 250, 254, 89 S.Ct. 1726, 1728, 23 L.Ed.2d 284 (1969). As in *Chapman*, the evidence against Concepcion is so overwhelming, it is subject to a harmless error analysis. *See also United States v. Mangone*, 105 F.3d 29, 33 (1st Cir.), *cert. denied*, 520 U.S. 1258, 117 S.Ct. 2424, 138 L.Ed.2d 187 (1997) (it is harmless error when the witness for the co-defendant implicated the defendant because the testimony was merely cumulative as to the conspiracy charge and did not contribute to the finding of guilt on the substantive fraud charges); *United States*

*v. Kirsh,* 54 F.3d 1062, 1069 (2d Cir.) *cert. denied,* 516 U.S. 927, 116 S.Ct. 330, 133 L.Ed.2d 230 (1995) (it is harmless error when a co-defendant's statements implicating defendant is elicited at the trial because the evidence of the defendant's guilt is overwhelming and the statements did not contribute to the verdict beyond a reasonable doubt).

Accordingly, the *Bruton* claim is without merit.

### F. Alleged Ineffective Assistance of Counsel—The Failure to Permit Concepcion to Testify in His Own Defense

Concepcion asserts that he was the only person in a position to rebut the testimony of the various witnesses who testified against him. He states in his petition and in his memorandum of law that he advised his counsel that he wanted to testify. However, contrary to his wishes, Concepcion's counsel waived his right to testify and rested his case without calling any witnesses. Petitioner also contends that his counsel "failed or refused to interview two witnesses who could have verified Concepcion's version of the Gines slaying, Oscar Oyole (sic) and Kenneth Colon". As a result, Concepcion concludes that his constitutional rights to testify on his own behalf and to obtain the testimony of necessary witnesses, was violated.

Further, in this regard, Concepcion states in his memorandum of law in support of his position, that "There is no question that Concepcion, struggled with Gines, and possibly fired the fatal shots, the question for the jury to resolve was whether the murder was committed in aid of racketeering over control of a drug spot and, hence, whether there was federal jurisdiction over the incident under 18 U.S.C. § 1959(a)(1). Since counsel failed to subpoena and have testify Colon, Oyole and/or

Babon, it was inexcusable to preclude Concepcion from testifying to the facts and circumstances surrounding the skirmish with Gines in order to establish the absence of a federal nexus. *Wright v. Estelle,* 572 F.2d 1071 (5th Cir.1978) (*en banc*). Concepcion's testimony could have been structured to limit it to the Gines and Aponte murders, barring cross-examination on other matters." (pp. 51–52). Similarly, says Concepcion, his testimony as to the Aponte murder could have challenged the testimony of Adam Pomales, the sole witness who incriminated him in that crime.

In order to prevail on an ineffective assistance of counsel claim, a defendant must first show that his counsel's performance was deficient and must then show that the deficiency caused actual prejudice to his defense. *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). The deficiency prong is established by showing that the attorney's conduct fell "outside the wide range of professionally competent assistance," *id.* at 690, 104 S.Ct. at 2066, while the prejudice prong is established by showing that there is a "reasonable probability" that, but for the deficiency, "the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. at 2068. This two-prong test applies to the evaluation of appellate counsel as well as trial counsel. *Clark v. Stinson,* 214 F.3d 315, 318 (2d Cir.2000); *Mayo v. Henderson,* 13 F.3d 528, 533 (2d Cir.1994). However, the court must also "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052.

The Second Circuit recently commented on the interplay of a defendant's right to testify and a claim of ineffective assistance of counsel, in *Rega v. United States* 263 F.3d 18, 21 (2d Cir.2001):

A defendant in a criminal case has the constitutional right to testify on his own behalf, *see Rock v. Arkansas,* 483 U.S. 44, 49–51, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987), and we have held that a "trial counsel's duty of effective assistance includes the responsibility to advise the defendant concerning the exercise of this constitutional right," *Brown v. Artuz,* 124 F.3d 73, 74 (2d Cir.1997). To bring a claim of ineffectiveness of counsel under the Sixth Amendment, however, a defendant must show not only counsel's deficient performance, but also a reasonable probability that the deficiency prejudiced the outcome. *See Strickland v. Washington,* 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) (defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.")

This right to testify is closely tied to the constitutional right to present a defense, "Although the source of this right is somewhat unclear, its existence is well established." *Williams v. Lord,* 996 F.2d 1481, 1483 (2d Cir.1993):

As the Supreme Court explained: "Whatever rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation Clauses of the Sixth Amendment, the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" *Crane v. Kentucky,* 476 U.S. 683, 690, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986) (citations omitted); *see also United States v. Almonte,* 956 F.2d 27, 30 (2d Cir.1992) (per curiam) ("The due process clause of the Fifth Amendment and the compulsory process clause of the Sixth Amendment guarantee each criminal de-fendant the right to present a defense.") (citing *Rosario v. Kuhlman,* 839 F.2d 918, 924 (2d Cir.1988)).

In *Brown v. Artuz,* 124 F.3d 73 (2d Cir.1997), a key case in this field, the Second Circuit determined that the defendant's right to testify was in the "personal rights" category, that is, it is waivable only by the defendant himself, regardless of tactical considerations. Also, the Court held that there was no "general obligation on the trial Court to inform a defendant of the right to testify or to ascertain whether the defendant wishes to waive that right." *Id.* at 79. Further, this Court agrees that judicial interference in counsel's strategic decision not to place his client on the stand "poses a danger that the judge will appear to encourage the defendant to invoke or waive his right" even when it is unwise to do so. *See e.g. United States v. Joelson,* 7 F.3d 174, 178 (9th Cir.1993). As stated in *United States v. Teague,* 953 F.2d 1525, 1533 (11th Cir.1992) "defense counsel bears the primary responsibility for advising the defendant of his right to testify or not to testify." In sum, the ultimate decision whether to take the stand belongs to the defendant, and counsel must abide by the defendant's decision.

Applying the *Strickland* rules to this situation, even if the Court accepts Concepcion's contention that "Concepcion advised his counsel that he wanted to testify that the Gines murder was not in aid of racketeering, and that he never ordered recommended or solicited Savage to slay Aponte," and that contrary to Concepcion's wishes, his counsel waived his right to testify and rested, this would not satisfy the "deficient performance" prong. It is clear that Concepcion wanted to testify only on the subject of the Gines and Aponte murders and on nothing else. Any reasonably prudent criminal defense attor-

ney would have advised Concepcion that he could not limit his testimony to only certain matters. Once he took the stand Concepcion could be cross-examined on any relevant issue with regard to any charge in the indictment. That means that Concepcion would have been questioned in detail and at length about his massive heroin and cocaine drug dealing organization; the millions of dollars collected; the shootings, beatings and torture of members and competitors; and the voluminous detailed records of the receipts and expenditures of the drug dealing with the names of participants boldly set forth. With reasonable certainty, Concepcion's testimony would have been a veritable disaster to his defense and a field day for the prosecution.

In view of the alleged requests by Concepcion to testify only on limited subject matters, even assuming his counsel denied him this opportunity, the Court finds that the performance of Concepcion's trial counsel did not fall below an objective standard of reasonableness nor did counsel make any tactical or strategic error in regard to Concepcion's failure to testify.

Moreover, even assuming that his counsel did prevent him from testifying, there was no "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068. The evidence of Concepcion's guilt that the Government placed before the jury, consisting of eyewitnesses, co-conspirators' testimony and damning exhibits was overwhelming. The situation confronting Concepcion's counsel would tax the ability of the finest defense lawyer. With reasonable certainty, had Concepcion testified, there would have been no different result. There was no ineffective assistance of counsel with regard to Concepcion's right to testify.

## G. *Alleged Ineffective Assistance of Counsel—the Failure to Challenge the Racial Composition of the Jury Panel*

Concepcion contends that, contrary to his wishes, his counsel refused to challenge "the grand and petit jury venire". He claims that except for one Hispanic person who was excused, there were no Hispanics or Asians on the jury that heard his trial. He further asserts that the jury "should have been composed of at least twenty percent Hispanic and Asians". Thus, Concepcion contends, there was a systematic exclusion of Hispanics and Asians "in the grand and petit juries", which violated his constitutional rights.

■ As stated in *United States v. Jackman,* 46 F.3d 1240, 1244 (2d Cir.1995), "the Sixth Amendment requires that jury panels be drawn from a source representing a 'fair cross section' of the community in which the defendant is tried." *Taylor v. Louisiana,* 419 U.S. 522, 536, 95 S.Ct. 692, 700–01, 42 L.Ed.2d 690 (1975); *United States v. LaChance,* 788 F.2d 856, 864 (2d Cir.) *cert. denied* 479 U.S. 883, 107 S.Ct. 271, 93 L.Ed.2d 248 (1986). Further, this fair cross section requirement applies only to the large jury pool involving the source of the jurors and not to the trial petit jury. *See Taylor,* 419 U.S. at 538, 95 S.Ct. at 701–02 ("Defendants are not entitled to a jury of any particular composition").

This rule was explained by the Second Circuit in *Roman v. Abrams,* 822 F.2d 214, 229 (2d Cir.1987):

We return to the principle that what the Sixth Amendment guarantees to a defendant is not that he will have a petit jury of any particular composition but that he will have the *possibility* of a jury that reflects a fair cross section of the community.

■ Further, "the equal protection clause of the fourteenth amendment condemns underrepresentation of minorities only if it is the product of intentional discrimination." *Alston v. Manson,* 791 F.2d 255, 257 (2d Cir.1986). In addition, the constitutional prohibitions in this regard are of a systematic exclusion of a distinctive group in the community. *Duren v. Missouri,* 439 U.S. 357, 364, 99 S.Ct. 664, 669, 58 L.Ed.2d 579 (1979). In order to establish a prima facie case, it was necessary for the petitioner to show that the racial underrepresentation, generally and on his venire, was due to systematic exclusion in the jury selection process. Although discriminatory intent is not an element of a Sixth Amendment "fair cross-section" claim, *United States v. Biaggi,* 909 F.2d 662, 677–78 (2d Cir.1990), the petitioner must offer sufficient evidence of underrepresentation to establish a prima facie violation. *United States v. Rosario,* 820 F.2d 584, 585 (2d Cir.1987); *United States v. Jenkins,* 496 F.2d 57, 64–66 (2d Cir.), *cert. denied* 420 U.S. 925, 95 S.Ct. 1119, 43 L.Ed.2d 394 (1975).

■ In this case, Concepcion has failed to establish any unfair racial composition or underrepresentation or systemic exclusion claim. Even assuming that the petitioner is correct in stating that the jury included only one Hispanic and no Asians, that fact alone is insufficient to establish a constitutional violation. Initially, the Court is puzzled by the claim that exclusion of Asian jurors violated his rights. Also, the petitioner failed to establish that this alleged underrepresentation was due to systemic exclusion of these groups in the jury selection process. Concepcion also failed to establish that the purported underrepresentation of Hispanic and Asian persons on his jury panel was not merely a regular random selection without racial implications of any kind. Nor has he alleged any impropriety in any part of the jury selection process, from the original computerized drawing of the jurors' names, to the telephone call-in procedure, the assembly of the entire panel and the particular selection of his jury.

The petitioner's position in this racial composition claim is based on conclusory assertions and sheer speculation. *See United States v. Aiello,* 814 F.2d 109, 113 (2d Cir.1987) ("Any generalities, conclusory assertions and hearsay statements will not suffice because none of these would be admissible at a hearing"). This deficiency is particularly true when, as here the federal habeas petition is presented to the trial judge. As stated in *United States v. McGill,* 11 F.3d 223 (1st Cir.1993):

> In determining whether the petitioner has carried the devoir of persuasion in this respect, the court must take many of petitioner's factual averments as true, but the court need not give weight to conclusory allegations self-interested characterizations, discredited inventions, or opprobrious epithets. *See Mack v. U.S.,* 635 F.2d 20 (1st Cir.1980); *Otero-Rivera v. United States,* 494 F.2d 900, 902 (1st Cir.1974). Moreover, when, as in this case, a petition for federal habeas relief is presented to the judge who presided at the petitioner's trial, the judge is at liberty to employ the knowledge gleaned during previous proceedings and make findings based thereon without convening an additional hearing. *See U.S. v. DiCarlo,* 575 F.2d 952, 954–55 (1st Cir.1978).

Accordingly, for the reasons stated above, in addition to the Court's knowledge of the proceeding, Concepcion's claim of ineffective assistance of trial or appellate counsel based on the composition of the jury panel, is without merit.

### H. Alleged Ineffective Assistance of Trial Counsel in Defending Against the Gines Murder Charge

Concepcion again raises the issue of the failure of the Government to connect the Gines murder with a federal crime under Section 1959(a)(1). In this regard he contends that his trial counsel could have called witnesses who would have established lack of federal jurisdiction. These witnesses were Babon, Kenneth Colon and Oscar Oyole. Concepcion claims that these three witnesses were available and "would have contradicted the Government's theory of the Gines killing, eliminated federal jurisdiction ... and caused the jury to acquit Concepcion". Yet, he complains, his counsel rested his case without presenting any witnesses and the Government's theory was uncontradicted.

 As the Government aptly points out, both Oyole and Colon pleaded guilty to the very same charge at issue here. In fact, Oyole's plea allocution specifically describes the shootout that let to Gines death as related to the narcotics trafficking activities of the Unknown Organization. It defies imagination to believe that either of them would testify favorably to Concepcion on this issue. Any reasonably competent defense lawyer would realize that their testimony would be seriously impeached by their plea allocutions. Also, there is no viable evidence that Babon would have testified any differently than Pomales, Rivera or Oyole, even if he was available to testify, which is somewhat doubtful.

Contrary to Concepcion's assertions, his trial counsel properly and vigorously represented him during the trial and in arguing the Rule 29 motion. In fact, his counsel initially raised and pursued the defense, now relied upon by Concepcion, that the Gines murder was not related to the activities of the unknown organization or done to enhance his position in it.

Thus, Concepcion's claim of ineffective assistance of counsel as to the Gines murder is also without merit.

### I. Alleged Ineffective Assistance of Counsel in Failing to Request a Special Verdict

Concepcion contends that his trial counsel was ineffective because he failed to request a special verdict regarding (1) which object of the dual-objective conspiracy was Concepcion's guilt based on and (2) the quantity of drugs chargeable to Concepcion. In his first argument, Concepcion claims that when an indictment charges a dual-objective conspiracy, the trial court should utilize a special verdict form for the jury to determine which drug, heroin or cocaine, if any, it intended to find guilt established beyond a reasonable doubt.

In *United States v. Orozco–Prada,* 732 F.2d 1076, 1083–84 (2d Cir.1984) the indictment charged the defendant with a conspiracy punishable under both Section 841(b)(1)(A) and Section 841(b)(1)(B). The former section, which involves cocaine, authorizes a sentence of up to fifteen years; the latter section which involves marijuana, allows a sentence of up to five years. The defendant's sentence of eight years was higher than the penalty authorized by Section 841(b)(1)(B). The Court held that in the absence of a special verdict, there was no way for the trial judge to know whether the jury intended to convict the defendant for a cocaine-related conspiracy, for a marijuana-related conspiracy, or for a conspiracy involving both drugs. The Court stated that a special verdict should be used where a dual objective conspiracy involves crimes subject to different statutory maximums.

■ However, that is not the situation in this case. Here, the defendant was charged with a dual object conspiracy involving heroin and cocaine. Both the heroin and cocaine trafficking carry the same mandatory minimum terms of ten years and the same maximum terms of life imprisonment. *See* 21 U.S.C. § 841(b)(1)(A) ("such person shall be sentenced to a term of imprisonment which may not be less than 10 years or more than life"). As stated in *United States v. Hazut,* 140 F.3d 187, 190 (2d Cir.1998), "The quantity of drugs attributable to a defendant at the time of sentencing is a question of fact for the district court, subject to a clearly erroneous standard of review." The government must prove the amount of narcotics involved by a preponderance of the evidence. *See United States v. Desimone,* 119 F.3d 217, 228 (2d Cir.1997), *cert. denied,* 525 U.S. 874, 119 S.Ct. 174, 142 L.Ed.2d 142 (1998). *See also United States v. Moreno,* 181 F.3d 206, 213 (2d Cir.1999).

Therefore, under these circumstances, the failure to request a special verdict for the jury to determine whether the Government proved a heroin or cocaine distribution conspiracy, could not have prejudiced the petitioner. Moreover, as previously stated, there was overwhelming evidence of the petitioner's guilt of conspiracy to traffic in *both* heroin and cocaine in massive amounts resulting in the collection of huge amounts of money. The Court recalls that, at the time of the arrest of one of the co-conspirators, the law enforcement officers at first thought the apartment floor was covered with a green carpet. In fact, the floor was entirely covered with piles of cash amounting to more than one million dollars, all from the sale of heroin and cocaine. In addition, the Unknown Organization kept meticulous records that were introduced in evidence and showed sales of large amounts of heroin and cocaine, in itemized detail, including names of participants, drug locations and the amounts of sales and expenses.

■ Concepcion's other contention in this regard, that his counsel was ineffective in not requesting a special verdict enabling the jury to determine the quantity of drugs chargeable to him, is also without merit. In a conspiracy case, the specific quantity of narcotics chargeable to a convicted defendant is not an issue for the jury, when the sentence does not exceed the maximum statutory sentence. At sentencing the Government must prove the amount of drugs chargeable to the defendant by a preponderance of the evidence, based upon the factors set-forth in the Federal Sentencing Guidelines. *See United States v. Stephenson,* 183 F.3d 110, 119 (2d Cir.1999) ("In the instant case, by contrast the statutory maximum tern is lifetime imprisonment regardless of whether McCurvin had been found guilty of a cocaine conspiracy or a crack conspiracy. The nature of the offense of conviction thus has no impact on the maximum term of imprisonment permitted by statute.") Thus, Concepcion's trial counsel's performance was not deficient, and, in any event, there was no prejudice to the petitioner's defense as a result of his attorney's performance in this regard.

Accordingly, Concepcion's ineffective assistance of counsel contention in regard to the "special verdict" claim is denied.

### J. Alleged Ineffective Assistance of Counsel With Regard to the Singleton Issue

By separate letter, Concepcion raises the ill-fated *Singleton* argument. *See United States v. Singleton,* 144 F.3d 1343 (10th Cir.1998) in which the Tenth Circuit panel determined that the Government's cooperation agreements with a testifying

witness violated the provisions of 18 U.S.C. § 201(c)(2), the anti-gratuity statute. That decision was quickly reversed by an *en banc* decision of that circuit. *See United States v. Singleton,* 165 F.3d 1297 (10th Cir.1999). Calling the original *Singleton* decision "patently absurd, the majority concluded that application of the statute to the United States conflicts with long-standing practice and an entire statutory scheme namely, the Federal Sentencing Guidelines." Accordingly, Concepcion's claim based upon the application of the anti-gratuity statute is without merit.

In sum, the petitioner failed to prove that his counsel's performance fell "outside the wide range of professionally competent assistance" in any manner. To the contrary, and in the personal observance of this Court, his trial counsel was extremely diligent, hardworking, efficient and vigorously defended his client in a very difficult and complex case. Further, the petitioner failed to prove that there was "a reasonable probability" that, even if all the petitioner's complaints had been satisfied, "the result of the proceeding would have been different". In view of the overwhelming evidence against Concepcion as to all convicted counts, he suffered no "prejudice" by any of his counsel's actions or failure to act.

### K. *Petitioner's Other Contentions*

Concepcion raises two additional contentions in his memorandum of law, which were not contained in his petition. These claims were apparently not referred to in the Government's memorandum in opposition. The Court will briefly address these claims. (See petitioner's memorandum pp. 43–45) First, Concepcion argues that the Gines killing "must be reclassified as a manslaughter" rather than a First Degree Homicide requiring a finding of malice. He states that "[i]f Concepcion fired the

fatal shots (a contention with which he takes issue), those shots were fired in the heat of passion."

This argument is without merit. The jury was properly charged with regard to intent as to this homicide, and the jury decided that the Government proved the petitioner's guilt beyond a reasonable doubt. The portion of the charge was as follows:

I instruct on the New York State crime of murder in the second degree based on intentional murder.

The crime of murder in the second degree is defined in Section 125.25 of the Penal Law and the language of that statute, applicable to the Gines, Rivera and Aponte deaths, reads as follows:

A person is guilty of murder in the second degree when, with intent to cause the death of another person, he causes the death of such person.

You will see from this statutory definition that this type of murder in the second degree is the intentional killing of another person. The principal distinguishing element in this type of murder in the second degree is an intent to kill the other person. The law provides that a person acts with an intent to kill when his conscious objective is to kill the other person.

Now, applying this law to the crimes charged in count seventeen and the thirteenth act of racketeering, before you can find that the defendant named committed the crime of murder in the second degree, the Government must have established from all the evidence in the case, beyond a reasonable doubt, as to the thirteenth racketeering act and count seventeen, three necessary or material factual elements, to wit:

1. That on or about May 12, 1988, in the County of Kings, the defendant

Manuel Concepcion shot James Gines with a gun.

2. That when the defendant Manuel Concepcion shot James Gines, he intended to cause his death, that is, that his conscious objective was to kill him.

3. That such shooting caused the death of James Gines.

All three elements must be proven, each beyond a reasonable doubt, before you can find that the defendant Manuel Concepcion committed the crime of murder in the second degree of James Gines. If the Government has failed to prove any of these three elements to your satisfaction beyond a reasonable doubt, you cannot find that the Government has proven the thirteenth racketeering act.

■■■ Similarly, the contention by Concepcion that the failure to charge "malice aforethought" in the indictment, precludes a finding of first degree murder and mandates resentencing, is also without merit. First degree murder under Guideline Section 2A1.1 involves "premeditated killing" and causing death "intentionally or knowingly." See Application Note 1. Moreover, the maximum term for both first degree murder (Section 2A1.1) and second degree murder (Section 2A1.2) is life imprisonment.

### L. Additional Issues Raised in the Petitioner's Four "Reply Briefs", Including the Petitioner's Supplemental Brief Filed in this Court on July 10, 2001

On October 26, 2001, the Court directed that a letter be sent to the Assistant United States Attorney in charge of this petition with copies to the pro se Petitioner and attorney Ruth M. Liebesman, addressing the issues raised in the four "Reply Briefs". The letter stated the following in part:

The petitioner then replied with four "Reply Briefs," (1) Petitioner's Preliminary Reply Brief, (2) Petitioner's Reply Brief Part II, (3) Petitioner's Reply Brief Part III, and (4) Petitioner's Supplemental Brief. This latter reply brief was filed in the Court on July 10, 2001.

A review of these four reply briefs reveals that new grounds have been raised for the first time.

To the extent that the petitioner's reply memoranda present new allegations and an *Apprendi* argument, the petitioner is generally required to offer these allegations in the form of a second or successive motion, which would require certification by the United States Court of Appeals for the Second Circuit. *See* 28 U.S.C. § 2255. Further, it is well settled in the Second Circuit that a party may not raise an argument for the first time in a reply brief. *See Frank v. United States*, 78 F.3d 815, 833 (2d Cir. 1996); *United States v. Gigante*, 39 F.3d 42, 50 n. 2 (2d Cir.1994) ("Arguments may not be made for the first time in a reply brief.") (citations omitted); *State Trading Corp. of India, Ltd. v. Assuranceforeningen Skuld*, 921 F.2d 409, 418 (2d Cir.1990) (" 'A busy district court need not allow itself to be imposed upon by the presentation of theories seriatim.' ") (citations omitted). U.S. ex rel. *Morgan v. McElroy*, 981 F.Supp. 873 (S.D.N.Y.1997).

For these two reasons, the Court is not required to reach the merits of the arguments raised by the petitioner in his various reply briefs. However, given the serious crimes of which the petitioner was convicted and the length of the sentence he is serving, the Court will address his claims on the merits.

However, in doing so, the Court will afford due process rights to the Government with regard to these newly raised

issues. *Accordingly, the Government is given until November 30, 2001 to respond to these issues.* The response should be in a letter form in as brief and concise manner as possible. (Emphasis supplied).

The newly-raised issues by the petitioner in the four reply briefs are, apparently, the following:

I. *Petitioner's Reply Brief, Part II*

(1) As to the Gines murder-Colon and Oyola did not plead guilty to § 1959(a)(1) but pled to § 1959(a)(4);

(2) As to the Gines murder-the Government did not indict the petitioner for committing the Gines murder "because he (Concepcion) knew it was expected of him by reason of his membership in the enterprise. This attempt to introduce an alternate theory of § 1959(a)(4) violates Concepcion's due process rights";

(3) The Government knowingly presented a false scenario to obtain § 1959(a)(1) jurisdiction for the Gines homicide;

(4) Prejudice spillover from the Gines homicide polluted the entire trial;

(5) The public was excluded from portions of the trial in violation of Concepcion's right to a public trial. Defense counsel was ineffective in failing to object to the public exclusion;

(6) The prosecutor used a peremptory challenge for the sole purpose of excusing the only potential Hispanic from the petit jury in violation of *Batson.*

II. *Petitioner's Reply Brief Part III*

(7) An evidentiary hearing should be held to determine the prejudicial effect of the "retroactive misjoinder" of the Gines murder, and the Lea Lopez attempted murder and assault charges (Counts 17, 18 and 19); the prejudicial effect of the prosecutor's misconduct;

and "the prejudicial effect of counsel's massive omissions."

III. *Petitioner's Supplemental Brief*

(8) The *Apprendi* argument;

(9) The indictment was defective because it omitted an essential element of the crimes charged in Counts 1, 2, 17, 19, 21, 28 and 30;

(10) At sentencing, the trial court imposed a sentence using § 1962(c) when the statute relied on should have been § 1963. Further, the petitioner was never charged with violating § 1963.

As stated above, please make your response to these newly-raised issues on or before November 30, 2001. Judge Spatt has directed me to advise you that there will be no extension of this deadline.

In response to the Court's October 26, 2001 letter, the Court received two letters from the Government dated November 30, 2001 and December 5, 2001. The Court also received a letter from the petitioner dated November 5, 2001.

Taking these communications in chronological order, in his November 5, 2001 letter the petitioner states that (1) the first three reply briefs were timely filed and do raise new issues that the Government should have the opportunity to respond; (2) the petitioner "should be able to respond to the Government's response"; (3) the fourth alleged reply brief "is not a reply brief, but a Rule 15 motion to amend the original 28 U.S.C. § 2255 due to the decision handed down by the Supreme Court in *Apprendi v. New Jersey,* 530 U.S. 466, 120 S Ct. 2348, 147 L.Ed 2d 435 (2000)"; (4) "the Government should not be afforded the opportunity to reply ANEW to issues it has already litigated".

In its November 30, 2001 response letters the Government states that:

Some of these recently raised claims seem to be reformulations of arguments raised earlier by Concepcion *but many raise completely new arguments.* As the Court's letter indicated, all of the newly raised arguments are clearly time-barred under the Anti-terrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Thus, while we respond to these issues pursuant to the Court's directive, our response is not intended to waive any objections ·that the government might have on procedural grounds based either upon untimeliness or Concepcion's failure to raise any of these issues on appeal. (Emphasis supplied).

The Government then proceeded to respond to the "completely new arguments" raised by the petitioner in its reply briefs, as to the following issues: (1) the court closure issue; (2) the *Batson* challenge; (3) the *Apprendi* claim; (4) alleged defects in the indictment; (5) the Gines murder and (6) the Section 1959 conviction.

### 1. *The Closure Issue*

Concepcion contends that it was reversible error for the Court to have closed the courtroom to spectators when "several of the cooperating defendant/witnesses were paraded into the Courtroom under the escort of the United States Marshals, at the prosecutor's request." Significantly, the petitioner cannot reveal when these "closures" allegedly occurred.

When a party seeks only partial closure, the strict rules set forth in *Waller v. Georgia,* 467 U.S. 39, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984) are not applicable. The moving party need only show "persuasive evidence of serious risk to an important interest" in ordering partial closure. *Ayala v. Speckard,* 131 F.3d 62, 71 (2d Cir. 1997). In addition, where only a partial closure is involved, the trial court need not consider other alternatives. *Id.* at 71.

In this case, the petitioner's "closure" contention has a more significant obstacle. The petitioner has not set forth when this alleged partial closure occurred, or the extent of the closure other than to suggest that it may have occurred while the Marshals were escorting cooperating witnesses to the stand. In addition, the petitioner states, without references to the record that "the Government is well aware of the dates and time of closure." Under these circumstances, the petitioner has not even raised the possibility that his right to a public trial was violated. Thus there could be no ineffective assistance of counsel in failing to object to the alleged exclusion of the public.

### 2. *The Batson Challenge*

In addition to his initial challenge to the composition of the petit jury pool, in a reply brief, the petitioner contends that the Government used a peremptory challenge to exclude the sole potential Hispanic juror. Even assuming that a *prima facie* case of national origin discrimination has been established there is no clear evidence to substantiate the factual portion of this claim—namely that there was an intentional discriminatory peremptory challenge of the sole potential Hispanic juror. Therefore, the Court cannot determine whether there could be a claim of ineffective assistance· of counsel in this regard. In sum, the record fails to establish the factual basis for the contention, and it is rejected.

### 3. *The Apprendi Issue*

The petitioner also requests resentencing under the major sentencing ruling of the Supreme Court in *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147

L.Ed.2d 435 (2000). In *Apprendi* the Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Id.* at 2362–63. The petitioner contends that "the maximum penalty for a conspiracy to distribute cocaine when no specific amount is proved to a jury beyond a reasonable doubt is twenty (20) years. *See* 21 U.S.C. § 841(a)(3), (b)(1)(c): *See also* 21 U.S.C. § 846 (penalty for drug conspiracy same as penalty for substantive offense)." Accordingly, Concepcion contends that he must be resentenced to a term of not more than twenty years on Counts 2 and 30.

a) *Retroactivity*

■ Although there are conflicting decisions on whether *Apprendi* should be applied retroactively, the Court is impressed with the decision of Judge Ward in *Rosario v. United States*, 00 CV 9695, 2001 WL 1006641 (S.D.N.Y. Sept. 27, 2001), in which he stated:

Teague analysis does not apply, however, to substantive rules, such as those construing the meaning of federal criminal statutes. *Bousley*, 523 U.S. at 620, 118 S.Ct. 1604 ("[B]ecause Teague by its terms applies only to procedural rules, we think it is inapplicable to the situation in which this Court decides the meaning of a criminal statute enacted by Congress.") *Accord Ianniello v. United States*, 10 F.3d 59, 63 (2d Cir.1993) ("the Teague line of cases does not purport to affect the holding [in *Davis v. United States*, 417 U.S. 333, 94 S.Ct. 2298, 41 L.Ed.2d 109 (1974), that a § 2255 petitioner is entitled to attack his conviction based on an intervening change in substantive law]"). This Court, while recognizing that the *Apprendi* rule contains procedural elements, concludes

that the primary feature of the new rule is its substantive construction of federal criminal statutes and that the rule is therefore retroactive.

As in *Rosario*, this Court is persuaded that *Apprendi* is a substantive rule of law and therefore is retroactive.

b) *The Apprendi Merits*

The *Apprendi* issue was crystalized in this circuit by the recent case of *United States v. Thomas*, 274 F.3d 655 (2d Cir. 2001). In *Thomas*, the defendants were convicted in January 1998, prior to the ruling in *Apprendi*. On January 15, 1998, Thomas was sentenced to 292 months. In *Thomas* the Second Circuit held:

We conclude, following *Apprendi's* teachings, that if the type and quantity of drugs involved in a charged crime may be used to impose a sentence above the statutory maximum for an indeterminate quantity of drugs,[2] then the type and quantity of drugs is an element of the offense that must be charged in the indictment and submitted to the jury.[3] We further conclude, overruling *United States v. Tran*, 234 F.3d 798, 806 (2d Cir.2000), that the failure either to charge drug type and quantity in the indictment or to submit the question of drug type and quantity to the jury is subject to plain error review pursuant to Fed.R.Crim.P. 52(b) when the defendant raised no objection before the District Court. Applying plain error review to the particular facts of this case, we conclude that the District Court erred, that the error was plain, that the error affected the defendant's substantial rights, and that the error seriously affected the fairness and the public reputation of judicial proceedings. We therefore vacate Thomas's sentence and remand for fur-

ther proceedings consistent with this opinion. *Id.* at 660.

Thus, under the rule enunciated in *Thomas,* "where drug type and quantity are used to authorize a sentence above the otherwise applicable statutory maximum, the failure either to charge drug type and quantity in the indictment or to submit the question of drug type and quantity to the jury is subject to plain error review pursuant to Fed.R.CrimP. 52(b) when the defendant raised no objection before the District Court". In this case, the imposition of a life sentence pursuant to 21 U.S.C. § 841(b)(1)(A), is beyond the statutory maximum penalty for the offenses charged, 21 U.S.C. § 841(b)(1)(C), and the failure to submit the question of the drug quantity constituted plain error and affected the defendant's substantial rights. *See Thomas, supra.*

### c) Harmless Error

Notwithstanding the above analysis applying *Apprendi* to the drug convictions, the Court finds that the error was harmless and does not compel the collateral relief sought in this petition. First, in Count 28 Concepcion was convicted of the murder of Robert Aponte, which, by itself, mandated a life sentence. Second and equally compelling, there was overwhelming proof at the trial that the petitioner's drug offenses involved in excess of one kilogram of heroin—the amount necessary to permit sentencing to life imprisonment. In addition, all of the Circuits, including the Second, have held that sentencing within the guidelines does not trigger *Apprendi* considerations. *Santana–Madera v. United States,* 260 F.3d 133, 141 (2d Cir.2001); *United States v. Breen,* 243 F.3d 591, 599 (2d Cir.2001); *United States v. Garcia,* 240 F.3d 180, 182–83 (2d Cir.2001); *United States v. White,* 240 F.3d 127, 135 (2d Cir.2001).

In this case, a reasonable jury had to find that the Government proved that more than one kilogram of heroin was involved. As stated in *United States v. Terry,* 240 F.3d 65, 75 (1st Cir.), *cert. denied* 532 U.S. 1023, 121 S.Ct. 1965, 149 L.Ed.2d 759 (2001) "there is no question that the petit jury in this case would have found 50 or more grams of cocaine base". In this case the proof was overwhelming that the petitioner trafficked in more than 40 kilograms of heroin per week. Also in *United States v. Strickland,* 245 F.3d 368, 382 (4th Cir.2001) it was held:

In short, the evidence establishing the threshold amounts of cocaine and crack cocaine for life imprisonment sentences was not only overwhelming, but also uncontested. We conclude, therefore, beyond a reasonable doubt, that had the quantities been submitted to the jury, the jury's verdict would have been the same.

Moreover, there cannot be separate *Apprendi* analyses for each separate possible maximum sentence. As a result of petitioner's conviction on the Aponte murder charge with a maximum sentence of life, "there is no *Apprendi* issue in this case as to whether the jury must determine whether the trigger point in the drug quantity range had been met." *United States v. Terry,* 240 F.3d 65, 75 (1st Cir. 2001).

Finally, on this subject, USSG § 561.2, provides that:

If the sentence imposed on the count carrying the highest statutory maximum is less than the total punishment, then the sentence imposed on one or more of the other counts shall run consecutively, but only to the extent necessary to produce a combined sentence equal to the total punishment. In all other respects, sentences on all counts shall run concur-

rently, except to the extend otherwise required by law.

In the Court's view, in this case, the twenty year maximum on the drug count, is "less than the total punishment" and, if the Court was curtailed by that statutory maximum, it could have imposed consecutive sentences. *See United States v. Moreno,* 2000 WL 1843232 (S.D.N.Y. Dec.14, 2000) (*Apprendi* does not preclude the court from ordering defendants' sentences on each count of conviction to run consecutively under U.S.S.C. § 5G1.2(d)).

Based on the reasons set forth above, the petitioner's application for re-sentence and/or of a jury determination on the amount of drugs, based on *Apprendi,* is denied.

### 4) *Alleged Defects in the Indictment*

The petitioner contends that the superseding indictment was defective in that it failed to include the element of an "unlawful act". In this regard, the petitioner also asserts that the Government failed to set forth the relevant penalty statute relating to the racketeering crime of which he was convicted, in that reference to 18 U.S.C. § 1963, the criminal penalty statute of RICO was completely omitted from the superseding indictment.

Rule 7(c)(1) of the Federal Rules of Criminal Procedure provides that an "indictment ... shall be a plain, concise and definite written statement of the essential facts constituting the offense charged." Fed.R.Crim.P. 7(c)(1). The Second Circuit has also explained that an "indictment must sufficiently inform the defendant of the charges he must meet and must provide enough detail so that the defendant may plead double jeopardy in a future prosecution based on the same set of events" *United States v. Goodwin,* 141 F.3d, 394, 401 (2d Cir.1997). However, in *United States v. Sabbeth,* 262 F.3d 207,

217, 218 (2d Cir.2001), it was stated that "an indictment need not be perfect, and common sense and reason prevail over technicalities." *See also Smith v. United States,* 360 U.S. 1, 9, 79 S.Ct. 991, 996–97, 3 L.Ed.2d 1041 (1959) ("Convictions are no longer reversed because of minor and technical deficiencies which did not prejudice the accused.").

Also, as explained in *Sabbeth,* "the scrutiny given to an indictment depends, in part, on the timing of a defendant's objection to that indictment." *See Goodwin,* 141 F.3d at 401; *United States v. Wydermyer,* 51 F.3d 319, 324 (2d Cir. 1995). Where a defendant raises an objection after a verdict has been rendered, an indictment should be interpreted liberally, in favor of sufficiency. *See Wydermyer,* 51 F.3d at 324–25. Therefore, without a timely objection—and none was made in this case—if a defendant suffers no prejudice from an omission in the indictment, reversal on this basis is not warranted.

Reviewing the superseding indictment in this case, count one clearly charged the petitioner with being a member of an enterprise that engaged in a pattern of racketeering activities. Also, the other counts raised by Concepcion recite the language of relevant statutes. Reviewing the superseding indictment as a whole, the Court finds that while it may have been advisable to include a reference to the racketeering penalty statute, 18 U.S.C. § 1963, that omission did not involve an essential element of the crime. Finally, this so-called "defect" was waived by the defendant's failure to object or even raise the issue until the service of his supplemental brief on July 10, 2001. Moreover, and most importantly, this alleged pleading defect has not affected petitioner's substantial rights, nor has it re-

sulted in prejudice to the petitioner in any manner.

### 5) *Revisiting the Gines Murder Issue*

In this Court's October 26, 2001 letter reviewing the "new" issues raised in the petitioner's four reply briefs, five of the ten issues concerned the Gines murder. The Court again emphasizes that in the direct appeal, the Second Circuit expressly dealt with the sufficiency of the petitioner's conviction of this murder.

In addition to the incidental-victim argument rejected above, Concepcion argues that there was no evidence that the "problem" he went to Metropolitan Avenue to solve was drug related and hence no evidence that its resolution could have affected his position in the Organization. This argument has no merit. Taken in the light most favorable to the government, the evidence showed that the Metropolitan Avenue gunfight was a matter of Organization business. Pomales testified that on a may 1988 day that he recalled with clarity because he had just been released from the hospital, he went to Concepcion's garage and found there Concepcion and coconspirator Kenny Colon. Pomales testified that Colon, whose job was to bring in the proceeds of narcotics sales, said he was there because one of their sellers "had a problem with somebody and didn't want him in the certain spot." Thought Pomales testified that he did not know what was meant by "spot," other coconspirator witnesses consistently referred to their "spot[s]" as the locations at which they would sell the Organization's narcotics. Pomales testified that Concepcion's response to Colon's report of a challenge for control of the "spot" was "[S]o let's go and take care of it." Concepcion and several of his men promptly went to Metropolitan Avenue, where Concepcion initiated the shootout. Another witness testified that one of Concepcion's targets in the shootout was a person she had previously seen selling narcotics at or near that location. When Melendez later told Concepcion "he was stupid because the money he was making, he could pay somebody to take care of his business, not do it himself," Concepcion, who was then still a lieutenant in the Organization, responded, "I'm that type of guy, I like to take care of my own actions." This was ample evidence from which a rational juror could infer beyond a reasonable doubt that Concepcion initiated the violence at Metropolitan Avenue in connection with the Organization's narcotics business, and that he did so in order to maintain and improve his leadership position within the Organization. *Concepcion*, 983 F.2d at 382–83.

The petitioner complains that Kenneth Colon and Felix Oyola did not plead guilty to § 1959(a)(1) but pled to § 1959(a)(4). The Court agrees with the Government's position that "it is clear that both pled guilty to the 'same' Section 1959 charge", namely "to charges arising out of the same set of events" with a nexus to the same racketeering enterprise. At the plea allocutions, this Court made a finding that all the elements of the crime had been met, including the relationship of the crime to the enterprise. Whether the pleas were to 18 U.S.C. § 1959(4) or § 1959(1), the two co-conspirators pled guilty to the same crime of which the petitioner was convicted.

In the case of Oyola, he pled guilty to racketeering (18 U.S.C. § 1962), but in a specific reference to the Gines murder as a predicate act. That conviction also required the showing of some nexus between the predicate act and the enterprise. "Indeed, when specifically asked by this Court

whether 'something happen[ed] to help the group or the enterprise in it's [sic] activities in narcotics to deal in narcotics' Oyola responded 'There was a shootout.'" (Government letter of November 30, 2001 quoting Oyola Plea at 21).

### 6) As to Prejudicial Spillover

The petitioner contends that "the prejudice spilling-over from the evidence of the Gines homicide polluted the earlier trial, mandating a new trial on the remaining counts." This Court has already determined that the Gines murder count should not be vacated. However, even assuming that there was error leading to the vacating of the Gines murder count, there was no unfair pollution of the trial.

■■■ The rule as to "spillover prejudice" was set forth in *United States v. Gore*, 154 F.3d 34, 48–49 (2d Cir.1998). In evaluating a claim of prejudicial spillover of evidence from an invalidated count, the Second Circuit looks to four factors: (1) whether the evidence from the invalidated count would have incited or aroused the jury to convict the defendant on the remaining counts; (2) whether the reversed and remaining counts arose out of similar facts, the evidence of which would have been admissible as to both; (3) whether the evidence on the reversed and on the remaining counts was completely dissimilar, permitting the inference that the jurors were able to keep the evidence separate; and (4) whether the strength of the government's case on remaining counts could withstand the potential spillover prejudice. *See also, United States v. Rooney*, 37 F.3d 847, 855–57 (2d Cir.1994).

In this case, the Gines and the other counts did not arise out of similar facts, and the strength of the Government's case on the remaining counts would absolutely withstand the potential spillover prejudice. This jury heard seventeen weeks of the operation of one of the most massive narcotic distribution organizations in the history of the City of New York, or elsewhere. This jury heard of the vertical composition of this organization, including the processing, cutting, packaging, selling in 13 spots involving more than 100 members. This jury heard numerous witnesses giving direct, firsthand testimony of Concepcion's role as a first lieutenant and later as the commander of this huge and far-flung drug organization. This jury heard eyewitness testimony of Concepcion's involvement in many acts of violence in support of this drug distribution conspiracy, including the murder of Robert Aponte and the kidnaping and brutal beating of George Espada.

Representing the five county Eastern District jury pool, this jury heard overwhelming evidence of Concepcion's guilt and even acquitted him of two counts, the attempted murder of Lopez and money laundering. In this Court's view, the Gines incident could not have so prejudiced the case, as to have affected the verdict on the other counts. With this clear picture before the trial judge there need be no evidentiary hearing on this subject. There could have been no legally sufficient "spillover prejudice" from the evidence in the Gines incident.

### CONCLUSION

For the foregoing reasons, the petition is denied in all respects. Further, having considered the standards for a certificate of appealability under Fed. R.App. Pro. 22(b) and 28 U.S.C. § 2253(c)(2), as set forth in *Barefoot v. Estelle*, 463 U.S. 880, 893 n. 4, 103 S.Ct. 3383, 3394, 77 L.Ed.2d 1090 (1983) and *Lucidore v. New York State Div. of Parole*, 209 F.3d 107, 112 (2d Cir.2000), the Court finds that the petitioner fails to make a sufficient showing to entitle him to a certificate of appealability.

Accordingly, the petition is dismissed and the Clerk of the Court is directed to close this case.

**SO ORDERED.**

APPENDIX A

Redacted Statement of Roberto Aponte dated March 14, 1989

Last week I was contacted by a person who told me that he or she did not have anything, meaning heroin, but next week he or she should have something because he or she knew some new people for heroin. Someone called me by telephone last Friday, March 10, 1989, and told me that he or she would have some heroin coming in Monday to Wednesday or next week. Someone again called me Monday night around 9:00 p.m. and told me to meet him or her in the city early tomorrow morning as he or she has what we need, meaning the heroin.

I then went to the city Tuesday morning. March 14 and went to a place located in Brooklyn. While at the place, someone called and told someone else to meet him or her at the Georgia diner in Queens. Someone asked me to help him or her load some money into the van which belonged to him or her. The money was in boxes. Someone told me there was about one million dollars in the boxes and wanted my help. For my help he or she was going to give me ten thousand dollars.

After we loaded the van, we all left the place. Someone left first in his or her red and silver van, along with someone, when I arrived at the place there was an '89 blue and white Cadillac. This Cadillac followed the others out of the place. This Cadillac was operated by someone's brother with his or her cousin as the passenger.

I then followed the van and the Cadillac in someone's silver Honda which he or she drove. I was in the front seat. Someone was sitting in the back seat.

* * *

We followed them to the Georgia diner in Queens. We arrived around 11:00 a.m. waited here until ten minutes to 1:00 p.m., someone received a beeper call. After the call he or she told someone and his or her brother to go to 94th Street and Astoria Boulevard in Queens.

Someone then told me to come with him or her in the van to help with the boxes. We again left the diner to travel to 94th and Astoria followed by the Cadillac and someone's Honda.

We arrived at the—at 94th and Astoria around one p.m. Someone got out of the van and went inside the diner. We had pulled into the parking lot of this diner, the van and the Cadillac.

Someone had broken down on the highway. That's why he or she was not at this diner. Someone's brother beeped me and told me what happened. I then spoke to someone and told him or her where I was at.

After several minutes of waiting in the parking lot, someone came out from the diner and told someone to get the money and put it into the red Monte Carlo. Someone then asked me to help him or her with the boxes of money.

Someone drove out of the parking lot and parked on Astoria Boulevard behind the red Monte Carlo.

We then loaded the Monte Carlo with the boxes of money assisted by someone.

I then waited for someone to arrive and stood by the phones. I watched someone cross the street with this guy and they walked down Astoria.

After a few minutes, I saw someone carrying a bag walking towards the van on

Astoria. When he or she reached the van, we were all arrested.

During all conversations I had with someone, he or she told me that this was his or her money. This is all that occurred on this day.